# Third District Court of Appeal

## State of Florida

Opinion filed August 30, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-1861
Lower Tribunal No. 15-19967
_____

**David Siegel and Tamara Siegel,**
Appellants,

vs.

**Tower Hill Signature Insurance Company,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Jorge Cueto, Judge.

Mintz Truppman, P.A., and Timothy H. Crutchfield; Insurance Litigation Group, P.A., and Tracy L. Kramer and John F. Lakin, for appellants.

Kelley Kronenberg and Jorge L. Cruz-Bustillo; Methe & Rockenbach, P.A., and Kara Berard Rockenbach and David A. Noel (West Palm Beach), for appellee.

Before LOGUE, SCALES and LINDSEY, JJ.

LINDSEY, J.

Insured homeowners David and Tamara Siegel appeal two orders granting final summary judgment in favor of their insurer, Tower Hill Signature Insurance Company. The court below concluded that Tower Hill complied with its policy obligations by paying the Siegels' claim based on its independent adjuster's estimate. The court also determined that the Siegels breached a condition precedent by failing to allow a plumbing inspection before filing suit. Because we find that genuine issues of material fact exist as to (1) Tower Hill's initial payment and (2) the Siegels' post-loss obligation to allow inspection, we reverse.

## I.    BACKGROUND

On May 15, 2015, a drain line collapsed under the foundation of the Siegels' home. The property was covered under a Tower Hill homeowners' policy and insured at replacement cost value.[1] The Siegels notified Tower Hill of their claim on June 8, 2015, and on June 19, 2015, the property was inspected by Tower Hill's independent adjuster. On August 12, 2015, the Siegels submitted an estimate to Tower Hill prepared by a public adjuster in the amount of $30,716.23 ($33,216.23 minus the $2,500 deductible). Tower Hill then sent a payment letter dated August 17, 2015, informing the Siegels that, based on Tower Hill's current information, the amount of their claim settlement was $4,304.75, which represented the

---

[1] Covered losses can be adjusted on the basis of either replacement cost value or actual cash value. Actual cash value is simply the replacement cost value minus depreciation.

2

$6,804.75 estimate prepared by Tower Hill's independent adjustor, less the $2,500 deductible. The payment letter advised the Siegels that this amount does not necessarily constitute a full and final settlement of their claim and stated that the Siegels could submit supplemental claims for any damages discovered in the covered reconstruction and repair of the above mentioned property. On August 28, 2015, the Siegels filed suit against Tower Hill for breach of contract, alleging that the $4,304.75 payment was inadequate.

Before Tower Hill was served with the lawsuit, it sent the Siegels two additional letters. In the first letter, dated September 3, 2015, Tower Hill informed the Siegels of their post-loss obligation to show the damaged property as often as reasonably required. Additionally, the letter stated that "Master Plumbing has been requesting inspection of the plumbing system of your home since August 18, 2015. To date, we have not been able to gain access." In another letter, dated September 9, 2015, Tower Hill informed the Siegels that it was rejecting their proof of loss and continuing its investigation. Tower Hill was served on September 10, 2015.

On February 10, 2016, Tower Hill moved for summary judgment, arguing that it had performed as required under the policy, applicable statute, and case law. The motion was supported by an affidavit of Tower Hill's corporate representative, David Polson, with the insurance policy, the estimate prepared by Tower Hill's

independent adjustor, and the August 17, 2015 payment letter attached as exhibits. Tower Hill filed a second motion for summary judgment on February 23, 2016, contending that the Siegels were in breach for failing to allow Master Plumbing to inspect their plumbing system prior to filing suit. In support, Tower Hill submitted another affidavit from Mr. Polson attaching the insurance policy, the September 3, 2015 letter, and the September 9, 2015 letter as exhibits. On June 7, 2016, the trial court held a hearing, and subsequently entered two orders granting Tower Hill's motions for summary judgment. After denying the Siegels' motion for rehearing and reconsideration of both of those orders, the trial court entered a final judgment on June 15, 2016. This appeal follows.

## II.    STANDARD OF REVIEW

The two issues before us are whether genuine issues of material fact exist as to (1) Tower Hill's required initial payment and (2) the Siegels' compliance with the policy's post-loss obligation to allow reasonable inspections. We review the trial court's orders granting final summary judgment *de novo*. See Save Calusa Trust v. St. Andrews Holdings, Ltd., 193 So. 3d 910, 914 (Fla. 3d DCA 2016). Similarly, a trial court's decision construing a contract presents an issue of law subject to *de novo* review. Flagship Resort Dev. Corp. v. Interval Int'l, Inc., 28 So. 3d 915, 920-21 (Fla. 3d DCA 2010) (citing Florida Power Corp. v. City of Casselberry, 793 So. 2d 1174, 1178 (Fla. 5th DCA 2001)).

4

## III. ANALYSIS

Summary judgment is proper under Florida Rule of Civil Procedure 1.510(c) where "the pleadings, depositions, answers to interrogatories, admissions, affidavits, and other materials as would be admissible in evidence on file show that there is no genuine issue as to any material fact." Arce v. Wackenhut Corp., 40 So. 3d 813, 815 (Fla. 3d DCA 2010). The movant bears the initial burden of demonstrating the nonexistence of any genuine issue of material fact. Id. (citing Valderrama v. Portfolio Recovery Assocs., LLC, 972 So. 2d 239 (Fla. 3d DCA 2007)). "Once competent evidence to support the motion has been tendered, the opposing party must come forward with **admissible** counter-evidence sufficient to reveal a genuine issue of material fact." Arce, 40 So. 3d at 815 (emphasis in original) (citing Fla. R. Civ. P. 1.510; Michel v. Merrill Stevens Dry Dock Co., 554 So. 2d 593, 596 (Fla. 3d DCA 1989)).

### A. Tower Hill's Initial Payment

Tower Hill's position is that although the Siegels obtained an estimate that was significantly higher than its initial payment, Tower Hill fully complied with the policy because its payment was based on the estimate prepared by its independent adjuster. In support, Tower Hill relies on Slayton v. Universal Prop. & Cas. Ins. Co., 103 So. 3d 934 (Fla. 5th DCA 2012).

As in this case, the underlying action in Slayton was for breach of contract, resulting from a disagreement over claim estimates. Following property damage suffered in a windstorm, Ms. Slayton, the insured homeowner, submitted an estimate prepared by a public adjuster for $61,638.00. Id. at 936. Her insurer paid $27,915.87, which was based on its lower estimate of the cost of repair. Id. The insurer notified Ms. Slayton that she could submit supplemental claims for additional damages "discovered in the covered reconstruction and repair" of her property. Id. Ms. Slayton did not submit any supplemental claims and instead filed suit against her insurer for breach of contract. Id. Despite Ms. Slayton's higher estimate, the Fifth District Court of Appeal upheld entry of a directed verdict in favor of the insurer, finding that the insurer's decision to pay the amount of its estimate was consistent with the unambiguous loss settlement provision in the policy. Id.

Tower Hill argues that Slayton controls and mandates affirmance because the loss settlement provision in this case is "identical" to the provision in Slayton. We disagree. Both loss settlement provisions provide, in pertinent part, as follows:

> b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
>
> (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or

6

replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) The limit of liability under this policy that applies to the building;

(b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c) The necessary amount actually spent to repair or replace the damaged building.

As the Fifth District explained in Slayton, "[t]he insurance provision cited above unambiguously limited [the insurer's] liability for the replacement or repair costs **to the lesser of** [a] the policy limits, [b] the replacement costs for like construction and use, or [c] **the necessary amounts actually spent to repair or replace.**" 103 So. 3d at 936 (emphasis added). Consequently, an initial payment based on the amount of the insurer's estimate (less deductible) coupled with an allowance for supplemental claims is certainly consistent with the terms of the loss settlement provision, as the Fifth District held in Slayton. Id. However, the analysis does not end there.

Section 627.7011(3)(a), Florida Statutes (2017), sets a minimum amount for initial payments made pursuant to a replacement cost homeowners' policy:

(3) In the event of a loss for which a dwelling or personal property is insured on the basis of replacement costs:

7

(a) For a dwelling, **the insurer must initially pay at least the actual cash value of the insured loss, less any applicable deductible.** The insurer shall pay any remaining amounts necessary to perform such repairs as work is performed and expenses are incurred. If a total loss of a dwelling occurs, the insurer shall pay the replacement cost coverage without reservation or holdback of any depreciation in value, pursuant to s. 627.702.

(emphasis added). On its face, the current version of the statute requires an initial payment of at least the actual cash value; that is, the replacement cost less depreciation.[2] This statutory requirement is reflected in an endorsement to the policy before us now:

b. (4) **We will initially pay at least the "actual cash value" of the insured loss, less any applicable deductible.** We shall pay any remaining amounts necessary to perform such repairs as work is performed

___

[2] The statute was amended in 2011. The prior version required payment of "replacement cost without reservation or holdback of any depreciation in value, whether or not the insured replaces or repairs the dwelling or property." § 627.7011(3), Fla. Stat. (2010). The Senate Staff Analysis for the provision now in effect explains the rationale behind the Legislature's enactment of the amendment:

Insurance companies assert that the current replacement cost and holdback provisions allow some homeowners to file inflated or even fraudulent claims because they are not required to make needed repairs to their dwellings or replace their personal property if they sustain a loss. Many states require the insurer to pay initially only the actual cash value, and then provide the balance of the replacement cost once the insured has replaced or repaired the property.

Fla. S. Comm. On Banking & Ins., SB 408 (2011) Staff Analysis 5 (Jan. 24, 2011).

and expenses are incurred. We will not require you to advance payment for such repairs or expenses, with the exception of incidental expenses to mitigate further damage. If a total loss of the covered dwelling occurs, we shall pay the replacement cost coverage without reservation or holdback of any depreciation in value, subject to the policy limits.

(emphasis added). Were it not for this endorsement,[3] the loss settlement provision cited above in Slayton and in the Seigels' policy, standing alone, would violate the initial payment requirement in section 627.7011 because the current version requires the insurer to pay "at least the actual cash value" as opposed to the lower of either the limit of liability, the replacement cost or the amount actually spent to repair or replace the damaged building.

Tower Hill contends that Slayton allows an insurer to fully comply with the initial payment requirement by simply paying the amount of its own estimate. This is plainly not so since Slayton explicitly declined to address the payment requirement in section 627.7011. Although Ms. Slayton argued on appeal that the loss settlement provision above violated section 627.7011, Florida Statutes (2009),[4] the Fifth District declined to address the argument because it was not preserved below. Slayton, 103 So. 3d at 936; see also Francis v. Tower Hill Prime Ins. Co., 42 Fla. L. Weekly D1565 (Fla. 3d DCA July 12, 2017). In short, Tower Hill

[3] No comparable policy endorsement is mentioned in Slayton.

[4] Under the statute in effect in 2009, the required payment was more demanding. See supra note 2.

9

cannot rely on Slayton because Slayton is silent as to the initial payment requirement found in section 627.7011 and in the endorsement to the Siegels' policy.

Tower Hill also argues on appeal that it complied with the initial payment requirement of the policy and section 627.7011 because it paid more than required: the replacement cost value instead of the lower actual cash value. We reject this argument because even if Tower Hill did pay the replacement cost based on its estimate, this amount would still be lower than the Siegels' actual cash value estimate, and consequently, a genuine issue of fact would still exist as to actual cash value. We find no support in Slayton—or any other authority Tower Hill cites[5]—for the proposition that the insurer is able to unilaterally determine, as a matter of law, actual cash value or replacement cost value.

---

[5] In addition to Slayton, Tower Hill relies on Luciano v. United Prop. & Cas. Ins. Co., 156 So. 3d 1108 (Fla. 4th DCA 2015) and Rizo v. State Farm Florida Ins. Co., 133 So. 3d 1114 (Fla. 3d DCA 2014). In both cases, the insureds brought breach of contract actions against their respective insurers for failure to pay supplemental claims. The circuit courts in both cases granted summary judgment in favor of the insurers on statute of limitations grounds. On appeal, this Court and the Fourth District reversed, finding that under a prior version of § 95.11(2)(e), the statute of limitations did not begin to run until the allegations of breach for failure to pay supplemental claims. See Rizo, 133 So. 3d at 1114 n.1 (citing § 95.11(2)(e), Fla. Stat. (2011)) (noting that the 2011 amendment to § 95.11(2) shortened the limitations period for property insurance claims and that subsection (e) was added to specify that in "an action for breach of a property insurance contract," the limitations period runs from the date of loss); Luciano, 156 So. 3d at 1110 n.1 (citing § 95.11(2)(e), Fla. Stat. (2011)) (§ 95.11(2)(e) was amended in 2011 to provide that the limitations period for an action for breach of property insurance contract runs from the date of loss). Tower Hill points us to language in both cases

Simply stated, Tower Hill, as the movant for summary judgment, has the initial burden to establish that it paid at least the actual cash value of the cost of repairs in compliance with the policy and the statute. Mr. Polson's affidavit does not do that. Rather, he merely avers that the property was inspected by Tower Hill's independent adjuster, the adjuster prepared an estimate for damages, and Tower Hill paid based on the estimate.

In addition to its Slayton argument, Tower Hill also contends that the Siegels' lawsuit was premature because Tower Hill had not yet issued a complete and final initial payment. It is clear from the August 17, 2015 payment letter that the $4,304.75 payment was based on the information Tower Hill had at the time. Undisputedly, by August 17, 2015, Tower Hill had both inspected the property and received the Siegels' estimate in the amount of $30,716.23. While it is true that Tower Hill informed the Siegels that the investigation was ongoing and that they could submit supplemental claims, Tower Hill indicated that a supplemental claim could only be submitted if the Siegels performed repairs. In other words, the payment letter suggests that Tower Hill had made its initial payment, and any subsequent payments were conditioned upon the Siegels initiating repairs. Indeed,

holding that the insurers' initial payments evidenced performance under the policy. But this language does not advance Tower Hill's position because unlike here, there were no allegations in Luciano or Rizo that the initial payments themselves were insufficient and constituted a breach.

11

this is the position Tower Hill takes in its Answer Brief, which states the following:

> Here, consistent with the policy, statute, and *Slayton*, Tower Hill paid at least the ACV of the loss by paying the higher RCV of the loss. Additionally, Tower Hill would be required by both the policy and the statute to pay additional money for the loss to Plaintiffs ***if*** they performed repairs in excess of the paid RCV of the loss. However, Plaintiffs admittedly performed no repairs.

Accordingly, Tower Hill has failed to meet its initial burden leaving a genuine issue of material fact as to whether Tower Hill is in compliance with the policy and the stature.

## B. The Policy's Post-Loss Inspection Provision

The court below found that the Siegels failed to allow a re-inspection of the property prior to filing this action and that such failure constituted a material breach on their part. The policy sets forth certain conditions, one of which is the following:

> SECTION I – CONDITIONS
>
> 2. Your Duties After Loss. In case of a loss to covered property, you must see that the following are done:
> . . . .
> f. As often as we reasonably require:
>
>     (1) Show the damaged property;

12

The policy also includes a "Suits Against Us" provision, which provides that "No legal action can be brought against us unless the policy provisions have been complied with . . . ."

Tower Hill contends that Master Plumbing's inability to schedule an inspection before the Siegels filed suit resulted in a violation of a condition precedent, giving rise to a presumption of prejudice—a presumption the Siegels made no effort to rebut. The court below agreed and specifically found in its order granting Tower Hill's motion for summary judgement that "there was a failure to allow a re-inspection of the insured property before the lawsuit was filed."

It is the Siegels' position that Tower Hill never requested a plumbing inspection prior to the Siegels filing suit and that there cannot be a failure to allow something that was never requested. Tower Hill contends that the affidavit of its corporate representative and attached letters dated September 3 and 9, respectively, along with two unauthenticated emails purportedly from Ms. Heidi Moore at Tower Hill to Priscilla Rivera and Chrissy Fillmon, who are otherwise unidentified, are sufficient to meet this burden. We respectfully disagree.

Mr. Polson avers that Tower Hill assigned Master Plumbing to inspect the Siegels' plumbing system on August 18, 2015 but that Master Plumbing was unable to inspect. Absent from the affidavit is any averment that Master Plumbing actually made contact with the Siegels and, if so, that the Siegels refused Tower

Hill's request. Mr. Polson further avers that on September 3, Tower Hill sent correspondence to the Siegels stating that "Master Plumbing has been requesting inspection of the plumbing system of your home since August 18, 2015. To date, we have not been able to gain access." On its face, neither the affidavit nor the letter state that Tower Hill made the request of the Siegels or, if not, either that Tower Hill or Master Plumbing advised the Siegels that Master Plumbing was making a request on Tower Hill's behalf. Similarly, there is no averment that the Siegels affirmatively refused such request.

Mr. Polson next avers that the September 9 letter informs the Siegels that "[w]e have requested numerous times to have Master Plumbing inspect the plumbing to no avail." However, there is no further elaboration or explanation as to how or to whom such request was made or as to why the plumbing inspection did not occur. Irrespective of the language used, both of these letters, as well as the unauthenticated emails, were dated after the lawsuit was filed. It is undisputed that the Siegels allowed Tower Hill's independent adjuster to inspect the property on June 19, 2017, yet, absent from Mr. Polson's affidavit is any averment that the Siegels refused to comply with any pre-litigation request made by either Tower Hill or Master Plumbing. Simply stated, there is no allegation anywhere in the record that Tower Hill requested the Siegels to provide a pre-litigation plumbing inspection and that the Siegels refused to do so. Accordingly, Tower Hill does not

14

meet its initial summary judgment burden to demonstrate that the Seigels are in breach for failure to comply with the policy's post-loss obligation to allow reasonable inspections.

## IV.   CONCLUSION

For the foregoing reasons, we find that genuine issues of material fact exist as to Tower Hill's required initial payment and the Seigels' compliance with the policy's post-loss obligation to allow reasonable inspections.

Reversed and remanded for further proceedings consistent with this opinion.