# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2023-1622

_____

HOMEOWNERS CHOICE PROPERTY
& CASUALTY INSURANCE
COMPANY, INC.,

    Appellant,

    v.

THOMAS CLARK and REBECCA
CLARK,

    Appellees.

_____

On appeal from the Circuit Court for Escambia County.
Amy P. Brodersen, Judge.


March 19, 2025

WINOKUR, J.


Thomas and Rebecca Clark were awarded $541,257.00 in this first-party property insurance action. The jury awarded that sum based on a replacement cost calculation of the damage to the Clarks' property. We reverse because the Clarks failed to present sufficient evidence that the insurance company did not adjust the actual cash value of the insured loss or the replacement cost of the damaged property.

# I

On September 16, 2020, Hurricane Sally hit the Gulf coast as a category two storm. The hurricane damaged the Clarks' property on Perdido Key, west of Pensacola, which they used as a vacation and rental property. This included damage to the property's roof and siding, which led to water leakage into the dwelling. The same day, the Clarks filed a claim with their insurer, Homeowners Choice Property & Casualty Insurance Company, for "water coming in the house," adding that "the roof was gone [and] the siding had been blown off."

Two days later, Homeowners Choice sent the Clarks a letter acknowledging receipt of their claim. The letter specified that the Clarks had to "make any reasonable and necessary repairs" to "protect [the] property from further damage" and asked that they "[k]eep an accurate record of the repair expenses including any invoices or receipts." The letter also attached a "Personal Property Loss Inventory Form" for the Clarks to fill out if any personal property was damaged due to the hurricane.

Within a month, Homeowners Choice sent an adjuster, Greg Stoner, to inspect the dwelling for damage and to prepare an estimate of the incurred loss. Stoner estimated that the incurred loss was $76,634.09 (based on an "actual cash value" (ACV) calculation, which is "replacement cost value" (RCV) minus depreciation). Two days after Stoner prepared his estimate, Homeowners Choice sent the Clarks another letter informing them of the estimated incurred loss and a check for $59,656.13 (the incurred loss minus the policy deductible and recoverable depreciation). That letter also provided that if the Clarks "during the course of the repairs" discovered "any hidden or additional damage that may impact the amount of loss" they had to contact Homeowners Choice immediately "so that [they could] determine whether an additional inspection of [the] loss [was] required." The Clarks cashed the check and used the funds to pay for the roofing and siding repairs. But they never provided receipts or invoices for the repairs to Homeowners Choice.

Sometime after receiving the check from Homeowners Choice, the Clarks hired a public adjuster, Tim Maloney. After visits to the

property, Maloney prepared his own estimate, which indicated a $440,093.90 ACV loss for the dwelling. The estimate provided the same figures for the ACV and RCV with no value for depreciation.

Maloney later prepared an estimate calculating the Clarks' personal property loss at $57,684.00 with an attached inventory—not the one provided for by Homeowners Choice—that did not distinguish between the RCV and ACV of the property. Around the same time, Maloney also prepared an estimate for the fair rental value lost ($43,479.23). The estimate provided no value for the normal expenses associated with the rental of the dwelling.

Eventually, the three estimates were sent together to Homeowners Choice with a Sworn Proof of Loss signed by the Clarks, which only attested—under oath—as to the final figure ($541,257.13). It is unclear from the record when this was done, but Homeowners Choice recognized receipt of the estimate and Sworn Proof of Loss in a letter sent to the Clarks on July 16, 2021. The letter stated that Homeowners Choice disagreed with the estimated amount, and "the scope of the damages related to" the loss. Accordingly, Homeowners Choice contracted with SDII Global Corporation to "re-inspect the roof, exterior and the interior, for cause and duration." The parties never reached agreement as to the scope of the original loss caused by the hurricane, which resulted in the underlying action for breach of the insurance contract.

Before filing the lawsuit, the Clarks never contracted mitigation services to reduce the growth of mold in the dwelling. Nor did they conduct any work on the property other than the roofing and siding. Nonetheless, Maloney's estimate included upgrades to the dwelling.

The case went to trial and Homeowners Choice moved for directed verdict on the ground that the Clarks failed to provide evidence that they actually incurred a greater loss than that indicated by Homeowners Choice. The trial court denied the motion and the jury returned a verdict in favor of the Clarks for substantially the full amount listed in their Sworn Proof of Loss. Homeowners Choice later renewed its motion for a directed

verdict, or in the alternative moved for a new trial. That too was denied. This appeal follows.

## II

Homeowners Choice asserts that the Clarks failed to show at trial that it breached the insurance policy. Specifically, Homeowners Choice maintains that the Clarks failed to meet certain conditions required by the policy—removing its obligation to pay the Clarks' claim—and that the Clarks failed to show that it did not provide the requisite ACV or RCV under the policy. Accordingly, it argues, the trial court should have granted its motion for directed verdict.

"An order on a motion for [a] directed verdict or for judgment notwithstanding the verdict is reviewed de novo." *Kopel v. Kopel*, 229 So. 3d 812, 819 (Fla. 2017) (citations omitted). We "view the evidence and all inferences of fact in the light most favorable to the nonmoving party[,]" and "must affirm the denial of the motion 'if any reasonable view of the evidence could sustain a verdict in favor of the non-moving party.'" *Id.* (citation omitted).

## III

We are bound to apply the plain text of the insurance contract when unambiguous. *See Washington Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943, 950 (Fla. 2013) ("Under Florida law, insurance contracts are construed according to their plain meaning."). The pertinent provisions here are as follows:

**COVERAGE A - Dwelling**
We cover:
1. the dwelling on the Described Location shown in the Declarations, used principally for dwelling purposes, including structures attached to the dwelling;

2. materials and supplies located on or next to the Described Location used to construct, alter or repair the dwelling or other structures on the Described Location; and

4

3. if not otherwise covered in this policy, building equipment and outdoor equipment used for the service of and located on the Described Location.

This coverage does not apply to land, including land on which the dwelling is located.

. . .

## COVERAGE C - Personal Property

We cover personal property, usual to the occupancy as a dwelling and owned or used by you or members of your family residing with you while it is on the Described Location. At your request, we will cover personal property owned by a guest or servant while the property is on the Described Location.

. . .

## COVERAGE D - Fair Rental Value

If a loss to property described in Coverage A, B or C by a Peril Insured Against under this policy makes that part of the Described Location rented to others or held for rental by you unfit for its normal use, we cover its:

**Fair Rental Value**, meaning the fair rental value of that part of the Described Location rented to others or held for rental by you less any expenses that do not continue while that part of the Described Location rented or held for rental is not fit to live in.

Payment will be for the shortest time required to repair or replace that part of the Described Location rented or held for rental.

Coverage A provides for any loss caused by a covered peril to the main dwelling. Coverage C for loss to personal property by a covered peril. And Coverage D for the loss of fair rental value while the covered structure (in this case the dwelling) is being repaired.

5

But to obtain these coverages, the Clarks had certain conditions that had to be met. Specifically, the Clarks had to "give prompt notice to [Homeowners Choice]" of the loss, "make reasonable and necessary repairs to protect the property[,]" "keep an accurate record of repair expenses[,]" prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss [and] [a]ttach all bills, receipts and related documents that justify the figures in the inventory[.]"

We turn to the Clarks' claim below and the evidence presented at trial to determine if these conditions were met. If these conditions precedent were not met, then Homeowners Choice was justified in not paying the Clarks' alleged loss. *See Starling v. Allstate Floridian Ins. Co.*, 956 So. 2d 511, 513 (Fla. 5th DCA 2007) ("[A] material breach of an insured's duty to comply with a policy's condition precedent relieves the insurer of its obligations under the contract." (citing *Goldman v. State Farm Fire General Ins. Co.*, 660 So. 2d 300, 302 (Fla. 4th DCA 1995))).

*Duty to Provide Notice*

We begin with whether the Clarks gave Homeowners Choice "prompt notice" of "a loss to covered property." Prompt notice is notice that is reasonable given the circumstances of the case. *LoBello v. State Farm Fla. Ins. Co.*, 152 So. 3d 599, 600 (Fla. 2d DCA 2014).

First, it is undisputed that the Clarks provided prompt notice to Homeowners Choice of the damage to the dwelling, a covered property under Coverage A. As for personal property, covered in Coverage C, the record shows, through the Clarks' own testimony, that they did not provide the list of personal property lost due to the hurricane to Homeowners Choice "promptly." The estimate prepared by Maloney with the list supplied by Mrs. Clark was dated April 13, 2021. But no testimony was presented that this estimate was provided to Homeowners Choice before the lawsuit was filed. The only evidence of Homeowners Choice's receipt of the personal property list was correspondence reflecting receipt on July 16, 2021—well after the September 2020 claim was filed.

6

Even if we take that date as the date of notification under Coverage C, it had been ten months since the hurricane. Because Homeowners Choice notified the Clarks two days after the hurricane that they had to provide such information, we cannot conclude that notice provided ten months after the hurricane was "prompt." The evidence shows that the Clarks did not comply with the condition precedent, which affects Homeowners Choice's obligation to pay on the policy under Coverage C. *See Starling*, 956 So. 2d at 513.

As to fair rental value, we reach the same conclusion because no record evidence exists that the Clarks provided Homeowners Choice with receipts or proof of a loss of fair rental value during the time the dwelling had to be repaired. All the Clarks provided was a summary of what income they had received in 2019 and some canceled bookings for the months following the hurricane. The Clarks did not provide any evidence of what rental value they would lose during the time necessary to repair the dwelling as is required by the policy.

But even if we take the Clarks' summary of the rental value for 2019 as proper notice, the evidence shows that it was not promptly given, and thus insufficient to rebut the presumption in Florida law that an insurer is under no obligation to pay a claim when the insured does not comply with a notice requirement. *See Arce v. Citizens Prop. Ins. Corp.*, 388 So. 3d 205, 212 (Fla. 3d DCA 2024) ("Prompt notice of a claim 'afford[s] the insurer an adequate opportunity to investigate, to prevent fraud and imposition upon it, and to form an intelligent estimate of its rights and liabilities before it is obliged to pay.' 'The notice requirement enables the insurer to conduct a timely and adequate investigation of all circumstances surrounding an accident.' The prompt notice provision recognizes the reality that in most, if not all, cases, the insured is in a far better position than the insurer to know when a loss has occurred. This is important because the insurer is obligated both to timely adjust a covered claim and make an appropriate, prompt payment to or on behalf of its insured for a covered claim. Hence, an insurer must know when a loss has arisen so that it may expeditiously determine whether some or all of a claimed loss was caused by a covered peril. . . . Balancing the rationale for the presumption against the potential harsh effects

7

of its application, the presumption is rebuttable, allowing the insured to demonstrate that the insurer was not prejudiced by the insured's noncompliance with the notice provision." (citations omitted)).

The Clarks provided no evidence that rebutted this presumption. Neither the Clarks nor Maloney testified as to why the personal property or fair rental value estimates were not provided to Homeowners Choice sooner, nor why receipts or other documentation justifying the estimated "losses" were not provided. Accordingly, the presumption that Homeowners Choice was prejudiced by the Clarks' failure to provide prompt notice of claimed losses was not rebutted and Homeowners Choice was under no obligation to make payments under the "claim" for damaged personal property and lost fair rental value. *See Security First Ins. Co. v. Visca*, 387 So. 3d 313, 320 (Fla. 4th DCA 2024) ("[N]otice was not prompt as a matter of law, and Security was entitled to a directed verdict on that discrete issue.").

### *Duty to Protect Property*

Next, we consider whether the Clarks "ma[de] reasonable and necessary repairs to protect the property," after the hurricane hit, as required by the policy. The evidence shows the Clarks did not meet this duty.

The Clarks did act quickly to tarp the dwelling. But it took the Clarks five to six months—from when Homeowners Choice paid them on their initial claim—to have the roof and siding of the dwelling replaced. The Clarks, however, assert they made continuous efforts to protect the dwelling, but this assertion is contradicted by the evidence presented at trial. The Clarks admitted that no work, beyond the roof and siding, has been done on the home since the hurricane. Indeed, the Clarks testified that the property has been "boarded up" and "sitting there." Thus, the Clarks did not take the necessary steps to protect the property from further damage—removing the obligation that Homeowners Choice pay under the policy. *See Huertas v. Avatar Prop. & Cas. Ins. Co.*, 333 So. 3d 767, 772 (Fla. 4th DCA 2022) ("'[F]or there to be a total forfeiture of coverage under a homeowner's insurance policy for failure to comply with post-loss obligations (i.e.

8

conditions precedent to suit), the insured's breach must be material.'" (quoting *Rodriguez v. Avatar Prop. & Cas. Ins. Co.*, 290 So. 3d 560, 563 (Fla. 2d DCA 2020))).

## *Duty to Repair Property*

As with protection, the Clarks also substantially failed to repair the dwelling to protect it from further damage. *See cf. People's Trust Ins. Co. v. Tosar*, 332 So. 3d 552, 561 (Fla. 3d DCA 2021) ("[T]his provision does not authorize an insured, after [the insurer] has exercised its right-to-repair option, either to hire its own contractor to effectuate the repairs or to obtain a loss payment. Indeed, such a construction of the provision [would] render meaningless the policy endorsement's clear mandate that when [the insurer] exercises its right-to-repair option, such repair is in lieu of issuing any loss payment that would otherwise be due under the policy." (citing *Universal Prop. & Cas. Ins. Co. v. Johnson*, 114 So. 3d 1031, 1036 (Fla. 1st DCA 2013))). Accordingly, the Clarks did not satisfy this condition precedent either.

## *Duty to Maintain Records and Receipts*

Finally, the record shows that the Clarks did not substantially comply with the post-loss condition that required them to keep an accurate record of receipts, payments, or other documents showing their expenditures due to the loss caused by the hurricane. The Clarks and Maloney all testified that no receipts were kept—other than those for the roofing and siding—nor provided to Homeowners Choice before or after the litigation was initiated. Moreover, the only receipts the Clarks did have, the roofing and siding, were not provided to Homeowners Choice until after the underlying action was initiated.

Thus, Homeowners Choice was not required to pay the purported claims because the Clarks never provided Homeowners Choice with proof that they incurred costs that required payment. Indeed, the Clarks admitted that no work was done, aside from the roof and siding which they were compensated for by Homeowners Choice.

## IV

Moreover, an analysis of the differences between ACV and RCV with respect to each disputed coverage category also demonstrates why Homeowners Choice was entitled to a directed verdict.

### *Coverage C: Personal Property*

The policy provided that settlement for loss of personal property will be paid "at actual cash value at the time of loss but not more than the amount required to repair or replace." But as discussed above, the Clarks did not provide Homeowners Choice with a claim for the loss of personal property at the time of the covered peril. Instead, they provided a list of personal property damaged or destroyed by the hurricane ten months later—after the mold growth had spread to several additional areas of the dwelling. The actual cash value at the time of loss, under these circumstances, could not be determined. *See, e.g.*, *Citizens Prop. Ins. Corp. v. Salazar*, 388 So. 3d 115, 118 (Fla. 3d DCA 2023) ("[T]here was no way for the jury to parse the estimate to determine the actual cash value figure without improper guessing and speculation.").

The Clarks estimated the personal property loss at $57,684.00. Attached to their estimate was a list of personal property allegedly damaged or destroyed. The list includes eighty-nine items and lists the purported price for each but no receipts or proof of ACV for those items were ever provided. For example, the Clarks claimed $9,795 as a loss for linens, sheets, and pillows that they replaced. But no proof of the ACV of those items, when they were replaced, was ever provided. Similarly, Mrs. Clark testified that she replaced "two sofa beds that mice had chewed up and the six chairs that the mice had destroyed," but those items were never claimed on the list of personal property, nor did the Clarks ever provide proof of that cost to Homeowners Choice. Likewise, Maloney admitted that the Clarks' washer was fully functional, and yet it was claimed as a loss on the personal property inventory.

No evidence in the record shows that the Clarks provided Homeowners Choice with the ACV of the personal property that

was lost due to the hurricane. Indeed, if we compare the sheet provided by Homeowners Choice and the inventory provided by the Clarks, it appears that Homeowners Choice's form provided for the original cost of the property, its RCV of the identical item or the repair cost, and the ACV of the item. The Clarks did not use that form; rather they provided a spreadsheet with the name of the item, the quantity, and the amount they claimed as the ACV.

As the policy states, Homeowners Choice would only pay the ACV of the items with a limit on their repair or replacement cost. ACV is calculated as RCV minus depreciation. *See Trinidad v. Florida Peninsula Ins. Co.*, 121 So. 3d 433, 443 (Fla. 2013) ("[A]ctual cash value is defined as replacement cost minus depreciation."). Thus, for the Clarks to properly request the ACV of their personal property they had to provide Homeowners Choice with the RCV of the items and the appropriate allocated depreciation for that item. Because this did not occur, and because a jury cannot speculate what the depreciation would have been, Homeowners Choice was entitled to a directed verdict as to the claimed Coverage C damages.

*Coverage D: Fair Rental Value*

Next, the policy provided that fair rental value would be paid "for the shortest time required to repair or replace that part of the" property that was damaged and unfit for renting and it defined "fair rental value" as "that part of the Described location rented to others or held for rental by you less any expenses that do not continue while that part of the Described Location rented or held for rental is not fit to live in." Thus, the recoverable fair rental value would be reached by (1) calculating space that was damaged and is no longer rentable; (2) calculating how long it would take to repair the unrentable space; and (3) calculating the fair rental value (revenue minus expenses) for the period required to conduct repairs of the unrentable space.

The Clarks claimed the fair rental value lost was $43,479.23. But that figure does not account for the calculation required under the policy. The Clarks provided a summary of how much rental income they made in 2019 but did not provide income for 2020. Nor did the summary show a trend of how much revenue the dwelling

11

generated year over year. With that in mind, the calculation of the Clark's lost rental income is as follows: first, the entire home was unrentable due to the damage from the hurricane and the mold growth; and second, it would take ten months to repair the dwelling. But even if we accept the Clarks' summary as sufficient evidence for the revenue that would have been generated in the ten months provided ($43,479.23), that is not the end of the calculation.

The policy defines fair rental value as revenue minus expenses that are no longer incurred for the period that renting is not occurring. But without evidence of expenses, the court could not arrive at the fair rental value for the specified period. The Clarks never provided Homeowners Choice with the necessary expenses to deduct from their lost revenue.

Maloney's estimate—which the Clarks relied on at trial to claim those were the damages they were entitled to—excludes "Normal Expenses." Thus, the Clarks never provided Homeowners Choice with the fair rental value that they were entitled to under Coverage D. A review of the record and transcript shows that no other evidence was presented to show what such expenses could be.

Indeed, the testimony of the Clarks supports this conclusion. Mrs. Clark testified that the estimate provided to Homeowners Choice showed $43,479.23 as "the gross revenue that [they] made from the property in 2019." Thus, the Clarks believed they were entitled to gross revenue rather than fair rental value. They did not deduct the expenses from their revenues to reach the fair rental value as the policy called for, nor did they present any evidence of such expenses.

Without evidence of the proper expenses that should be deducted from the revenues for renting, a reasonable jury could not reach a verdict that the Clarks were entitled to the requested fair rental value lost in their sworn proof of loss and Maloney's estimate. Thus, Homeowners Choice was entitled to a directed verdict as to Coverage D.

*Coverage A: Dwelling*

Finally, under the settlement provisions for loss to a dwelling under coverage A, the Clarks had several avenues to proceed. The policy provided the following:

b. Buildings under Coverage A or B [shall be covered] at replacement cost without deduction for depreciation, *subject to the following*:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:
   (a) The limit of liability under this policy that applies to the building;
   (b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or
   (c) The necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:
   (a) The actual cash value of that part of the building damaged; or
   (b) That portion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

. . .

13

(4) We will pay no more than the actual cash value of the damage unless:

 (a) Actual repair or replacement is complete; or

 (b) The cost to repair or replace the damage is both:

  (i) Less than 5% of the amount of insurance in this policy on the building; and

  (ii) Less than $2,500.

 (c) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim for any additional liability according to the provisions of this Condition 5. Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

(Emphasis supplied). It is unclear from the record under which provision the Clarks sued, thus we analyze each to determine whether there was sufficient evidence to support each provision.

A

Under condition 5.b.(1) the Clarks would be paid RCV for the loss to the dwelling if the loss to the dwelling was 80% or more of the insurance limit. The limit for coverage A was $471,200.00, meaning that the dwelling had to suffer at least a $376,960.00 loss to trigger that provision. Taking Maloney's estimate at face value the dwelling did suffer at least 80% of loss, which would trigger condition 5.b.(1). However, that did not mean that the Clarks would simply be paid the RCV upfront.

Condition 5.b.(1) specifically provides that Homeowners Choice "will pay the cost to repair or replace" the damaged property but not to exceed the least of the following: "(a) The limit of liability under this policy that applies to the building; (b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or (c) The necessary amount actually spent to repair or replace the damaged building."

14

When we take each of those limits, we can conclude that sub-subsection (a) is not applicable because the Clarks did not request the limit of the coverage A policy. Thus, we must determine if sub-subsection (b) or (c) was the "least" of the two. Sub-subsection (b) provides for the RCV but only for "that part of the building damaged" and only for "like construction and use on the same premises." We read that provision by its plain language to mean that Homeowners Choice will not pay for upgrades and will only pay for those parts of the dwelling that were directly damaged by the covered peril.

Sub-subsection (c), on the other hand, provides that Homeowners Choice will pay the "necessary amount actually spent to repair or replace the damaged building." So, Homeowners Choice would pay the Clarks for what they spent in repairing or replacing the portions damaged, as reimbursement once expenses are actually incurred. It is difficult to conclude which of these is actually the lesser of the two in this case.

Because the Clarks provided an estimate that covered a broader scope than what was actually damaged and that included materials not originally found in the dwelling (for example, upgraded materials rather than in-kind replacements or repairs) it cannot be determined from the evidence whether the estimate is the least amount necessary to repair or replace the damaged portions of the subject dwelling. Likewise, the Clarks never provided Homeowners Choice with any proof of expenses—with perhaps the exception of the roof and siding—to justify reimbursement under sub-subsection (c). Without evidence to answer these questions, we cannot determine if condition 5.b.(1) was the premise of the Clarks' breach of contract lawsuit.

Thus, no sufficient evidence is present in the record for a reasonable jury to conclude that Homeowners Choice breached condition 5.b.(1) of the policy. So, we move on to condition 5.b.(2).

B

Condition 5.b.(2) is like its predecessor, but it is triggered when the loss claimed is less than 80% of the policy limit rather than greater than as in subsection 5.b.(1). It provides that

15

Homeowners Choice will pay the greater of the following amounts (subject to the policy limit):

(a) The actual cash value of that part of the building damaged; or

(b) That portion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

Sub-subsection (a) states that Homeowners Choice will pay the ACV but only of the portion of the covered dwelling that was damaged by the covered peril. And that under sub-subsection (b), Homeowners Choice will pay the "cost to repair or replace" only the portion of the covered dwelling that was damaged by a covered peril.

For both sections, Homeowners Choice would only be liable to cover a loss to damaged portions of the dwelling. Even using Maloney's estimate, substantial portions of the dwelling were not damaged by the hurricane. We cannot—on this record—say that Homeowners Choice breached condition 5.b.(2), and it was error for the trial court to deny Homeowners Choice's motion for a directed verdict.

C

Having analyzed the applicable replacement cost conditions, we turn to the exception indicated in condition 5.b.(4). There, the policy provides that whether payment is made under 5.b.(1) or (2), Homeowners Choice "will pay no more than the actual cash value of the damage" unless the following is met: "(a) Actual repair or replacement is complete; or (b) The cost to repair or replace the damage is both: (i) Less than 5% of the amount of insurance in this policy on the building; and (ii) Less than $2,500."

Thus, Homeowners Choice was always liable either under 5.b.(1) or (2) for the ACV of the damage, not the RCV. Homeowners

16

Choice could, however, be liable for the RCV of the damage caused to the subject property if the Clarks showed that "[a]ctual repair or replacement [was] complete" or if the cost to repair or replace was "[l]ess than 5% of the . . . insurance . . . and [l]ess than $2,500."

This language reflects the difference between RCV and ACV: The former can always be recovered as reimbursement while the latter deducts depreciation to offset the fact that no repairs or replacement work has actually been done at the time the monies are distributed. *See Goff v. State Farm Fla. Ins. Co.*, 999 So. 2d 684, 690 ("'As replacement cost policies are intended to operate, following a loss, both actual cash value and the full replacement cost are determined. The difference between those figures is withheld as depreciation until the insured actually repairs or replaces the damaged structure.'" (citation omitted)).

Applying this condition, we conclude that Homeowners Choice was never liable for RCV, only ACV. And that the Clarks presented no evidence that the claimed damage was less than 5% of the policy limit and less than $2,500 worth of damage. Thus, that provision does not apply—which leaves sub-subsection 5.b.(4)(a) remaining.

D

Sub-subsection 5.b.(4)(a) states that RCV will be paid if and only if "[a]ctual repair or replacement is complete." But that provision was not satisfied here. The record shows that the Clarks never notified Homeowners Choice that work was done on the damaged dwelling—the roof and siding—or that work was ever completed. Moreover, the record shows that no other "repairs or replacement" of damaged parts of the dwelling took place. Thus, the Clarks failed to show that Homeowners Choice breached sub-subsection 5.b.(4)(a) because Homeowners Choice was under no obligation to pay ACV when it was not shown that "actual repair or replacement" was "complete." *See* § 627.7011(3)(a), Fla. Stat. (2020).

E

Finally, the policy provides an alternative loss settlement method. Condition 5.b.(5) states the following:

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis.

You may then make claim for any additional liability according to the provisions of this **Condition 5. Loss Settlement**, provided you notify us of your intent to do so within 180 days after the date of loss.

That provision mirrors the language of section 627.7011(3)(a), which states the following:

(3)   In the event of a loss for which a dwelling or personal property is insured on the basis of replacement costs:
(a)   For a dwelling, the insurer *must* initially pay *at least* the actual cash value of the insured loss, less any applicable deductible. The insurer *shall* pay any remaining amounts necessary to perform *such repairs as work is performed and expenses are incurred*.

§ 627.7011(3)(a), Fla. Stat. (emphasis supplied).

Taking the two together, the policy provides for at least the ACV of the claimed loss and then for the RCV of the claimed loss as repairs and replacement are completed. *See id.* This is not far from the requirements of condition 5.b.(4)(a).

Essentially, the Clarks could obtain the ACV for the value of the loss up front, and then recover the RCV for repairs and replacement work they complete and pay for as reimbursements later. Accordingly, no breach occurred—or at least no evidence was presented supporting one.


V


In summary, the Clarks contended that the payment of $59,656.13 was an insufficient ACV for the loss claimed. Although Homeowners Choice paying its estimate is not enough to show that

18

it paid "at least the actual cash value of the insured loss[,]" *see Siegel v. Tower Hill Signature Ins. Co.*, 225 So. 3d 974, 978–79 (Fla. 3d DCA 2017), the Clarks misconstrue the burdens at issue here.

Section 627.7011(3)(a) places the initial burden on the insurer to show that it paid "at least the actual cash value of the insured loss." But once the insurer provides an ACV estimate and pays that estimate sum, the burden shifts to the insured to demonstrate that the payment did not reflect the fully insured loss. A disagreement between the parties as to the scope and extent of the damage is resolved by a factfinder. *See cf. Salazar*, 388 So. 3d at 118 (discussing how a directed verdict should be granted when an insured fails to satisfy his burden to show the insurer did not pay sufficient ACV for a covered loss).

But when—as here—no evidence can support a disagreement as to ACV, a factfinder cannot conclude which of the two amounts is correct. Just as the courts found in *Salazar* and *Universal Prop. & Cas. Ins. Co. v. Qureshi*, 396 So. 3d 564, 566–67 (Fla. 4th DCA 2024), we too conclude that when (1) an insured's estimate and evidence provides only for RCV costs and (2) no evidence is presented to challenge the insurer's ACV payout, no breach of contract occurs when the insurer fails to pay monies under the insured's estimate. *See Salazar*, 388 So. 3d at 118 ("Here, the homeowner did not produce any evidence to establish her damages exceeded Citizens' initial payment. Thus, Citizens was *not yet obligated to pay any additional amount or matching costs*." (emphasis supplied)); *Qureshi*, 396 So. 3d at 566 ("Universal argues that the trial court reversibly erred by allowing the insureds to introduce into evidence at trial the estimated repair costs *for work that was never performed* even though both the policy's terms and section 627.7011(3)(a) require payment by the insurer only 'as work is performed and expenses are incurred.' We agree." (emphasis supplied)); *id.* at 568 ("Because the trial court impermissibly allowed the jury to consider evidence of estimated *but not yet incurred repair costs* in determining recoverable damages, we reverse and remand[.]" (emphasis supplied)).

Accordingly, there was insufficient evidence presented at trial for a reasonable jury to conclude that Homeowners Choice

breached a term of the policy when the Clarks could not—and did not—show that Homeowners Choice was liable for the RCV of the damage caused by the hurricane, thus directed verdict should have been granted.

REVERSED and REMANDED for further proceedings consistent with this opinion.

OSTERHAUS, C.J., and LEWIS, J., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Curt Allen, Bryan D. Hull, and Laura B. Labbee of Bush Ross, P.A., Tampa, for Appellant.

George A. Vaka and Robert C. Hubbard of Vaka Law Group, Tampa; Andrew P. McDonald and David D. Barnhill of McDonald & Barnhill, P.A., Tampa, for Appellees.