BENTON, J.
Associated Industries Insurance Company, Inc. (AIIC), a workers’ compensation insurance carrier, appeals the final judgment entered below insofar as it denies relief requested by AIIC’s second amended complaint concerning certain assessments for calendar year 2000. As successor to the Department of Labor and Employment Security, the Department of Financial Services (Department) cross-appeals insofar as the final judgment granted AIIC (partial) relief. We affirm on the appeal, but reverse on the cross-appeal.
The dispute turns, in two different respects, on the manner of calculating assessments levied on workers’ compensation carriers. Applicable statutes provided simply that assessments be based on “net premiums written,” § 440.49(9)(b)(3), Fla. Stat. (1999), amended, by ch. 2000-150, § 2, at 564-65, Laws of Fla., and “net premiums collected.” § 440.51(l)(b), Fla. Stat. (1999), amended by.ch. 2000-150, § 3, at 565-66, Laws of Fla.[1] In calculating the assessments, however, AIIC reduced the amounts of premiums written and collected by subtracting premiums AIIC itself paid to reinsurers (so-called “ceded premiums”) and by subtracting brokerage fees and commissions AIIC paid its agents.
The (im)propriety of such deductions has not been made an issue on this appeal as such. AIIC abandoned everything below but count two of its second amended complaint. Count two proceeded on the theory that, because of various communications between AIIC’s agents and departmental personnel, the Department was es-topped to argue that the deductions were not authorized by statute; and did not allege that any statute affirmatively authorized the deductions.[2] Nor has AIIC invoked the tipsy coachman rule on the cross-appeal.
The Division of Workers’ Compensation within the Department has had responsibility for collecting assessments from workers’ compensation carriers over a period of many years. In Florida Depart *1254 ment of Financial Services v. RISCORP Insurance Co., 871 So.2d 261 (Fla. 1st DCA 2004), we recounted history that is also pertinent to the present case:
In 1975, the Legislature amended sections 440.49 and 440.51, which had both used the term “gross premiums collected,” to prescribe that assessments would be based on “net premiums collected.” See Ch. 75-209, §§ 24-25, at 475-79, Laws of Fla. In 1993, the Legislature amended section 440.49, changing “net premiums collected” to “net premiums written.” See Ch. 93-415, § 43, at 177, Laws of Fla. Neither term has been statutorily defined. As a result of the 1993 amendment, DLES adopted the following rule:
Net premiums written are all premiums written less return premiums arising from policies issued by an insurer. For insurance companies, assessable mutuals and commercial self-insurance funds this is the same information you are required to report to the Department of Insurance on page 14 of the National Association of Insurance Commissioners Annual Statement.
Fla. Admin. Code R. 38F-4.001(2). This rule was repealed on December 18,1995, as part of an effort by Governor Chiles to reduce the number of agency rules. See 21 Fla. Admin. W. 7395 (Oct. 27, 1995). In 1997, the Legislature enacted a law authorizing the deduction of “any amount paid or credited as dividends or premium refunds ... by the insurer to its policyholders” from “net premiums written” and “net premiums collected,” as contained in sections 440.49 and 440.51. See § 624.5094, Fla. Stat. (1997). In 2000, in response to this litigation, the Legislature attempted to clarify the terms at issue by setting forth:
Legislative intent.. — It is the intent of the Legislature to clarify that the terms “net premiums written” and “net premiums collected” as used in chapter 440, Florida Statutes, have meant and continue to mean premiums arising from workers’ compensation policies issued by an insurer in this state as the primary insurance carrier without deduction for ceded reinsurance premiums transferred to an insurance company for reinsurance purchased or any premium expense attributable to purchasing reinsurance.
Ch. 00-150, § 1, at 564, Laws of Fla.
[[Image here]]
On September 22, 1999, DLES sent Bulletin # 209 to all carriers and self-insured funds in Florida, explaining that the Division would collect assessments for the SDTF based on “net written premium,” which the Division interpreted to mean “all premiums written less return premiums arising from policies issued by an insurer.” Bulletin #209 further explained that the Division would collect the WCATF assessments based on “net premium collected,” which the Division interpreted to mean “all premiums, including those ceded to rein-surers.”
RISCORP Ins. Co., 871 So.2d at 263-64. In light of this history, the trial court ruled that the Department was not estopped to challenge deductions AIIC took for “ceded premiums” in 2000, and disallowed the deductions. See generally Dep’t of Revenue v. Hobbs, 368 So.2d 367, 369 (Fla. 1st DCA 1979) (“The mere fact of non-collection is hardly a basis for estoppel.”).
In explaining her ruling, the trial judge made several important points concerning the “exceptional circumstances” necessary for a governmental agency to be estopped. *1255 Equitable estoppel will apply against a governmental entity only in rare instances and under exceptional circumstances. Council Brothers, Inc. v. City of Tallahassee, 634 So.2d 264 (Fla. 1st DCA 1994). The elements of equitable estoppel are: (1) a representation as to a material fact that is contrary to a later asserted position; (2) reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon. Id. The additional “exceptional” circumstances necessary to invoke estoppel against a governmental agency consist of (1) conduct by the government that goes beyond mere negligence and that will cause serious injustice; and (2) a showing that the application of estoppel will not unduly harm the public interest. Id.; see also Alachua County v. Cheshire, 603 So.2d 1334 (Fla. 1st DCA 1992). Equitable estoppel has been most frequently invoked against government agencies in cases in which the government has either made affirmative representations or knowingly acquiesced in plaintiffs conduct. See, e.g., Branca v. Miramar, 634 So.2d 604 (Fla.1994); Hittel v. Rosenhagen, 492 So.2d 1086 (Fla. 4th DCA 1986); Council Bros., Id.; Kuge v. State, 449 So.2d 389 (Fla. 3d DCA 1984); Department of Revenue v. Anderson, 389 So.2d 1034 (Fla. 1st DCA 1980); Hardy, Hardy & Assoc., Inc. v. State, 308 So.2d 187 (Fla. 1st DCA 1975); and Coppock v. Blount, 145 So.2d 279 (Fla. 3d DCA 1962).
It is important, however, to carefully examine the development of the case law pertaining to equitable estoppel against the government....
[[Image here]]
In regard to the year 2000 retroactive assessments for ceded premiums, the Court cannot find that the stringent requirements for equitable estoppel against the State have been met. The Court acknowledges that the chaotic articulation of policy over the years led to inequitable results in the assessment process. AIIC was not, however, the victim of that bureaucratic chaos; AIIC in fact benefitted from its vigilance in ensuring that it could continue to deduct ceded premiums from' its assessment base, while other insurers, like Riscorp, consistently paid such assessments. The Court does not concur in the State’s assertion that AIIC essentially bullied DLES into allowing it to deduct ceded premiums, and should therefore be precluded from asserting an estoppel; whether they applied extraordinary pressure to DLES or not is insignificant. DLES could have told AIIC to stop the practice at any time, but did not....
In examining the elements of equitable estoppel described in Council Brothers and Cheshire, AIIC has not proven that the retroactive assessment for ceded premiums in the year 2000 was precluded by any particular conduct on the part of DLES personnel during that year.... Even if DLES personnel had consistently told insurers like AIIC that they would ignore the law and continue to permit the deduction of ceded premiums, the Court cannot accept AIIC’s position that it had the right to rely on such representations. It seems obvious that AIIC hoped that DLES would not seek retroactive assessments, and felt that Charles Williams, the Governor’s Office, and perhaps others involved in the legislative process had provided assurances that the State would not do so. That is not, however, what the law said, and it is certainly conceivable that those individuals charged with interpreting and enforcing the new law may have concluded, for a variety of reasons, that the assessments had to be made.
*1256 The Court also cannot find on the evidence here that the actions of DLES in seeking to retroactively collect assessments on ceded premiums will “... cause serious injustice.” Council Brothers. In fact, the retroactive assessment was more likely to provide some redress and equity to insurers that had consistently paid assessments on ceded premiums; to them, the retroactive assessments would reduce their future assessments, and level out the inequities in assessments paid by individual insurers in years past. In addition, if the Division determined that the assessments should be made, it would certainly be in the public’s interest to have those assessments pursued. If the purpose of the trust funds is to provide adequate administrative support for the workers’ compensation insurance system, and to do so in a fair and equitable manner, DLES’ retroactive assessments against AIIC for the year 2000 would support fairness and equity in the funding of the trust funds. In that sense, the application of estoppel could indeed “harm the public interest.” Council Brothers.
The case law also establishes that the estoppel element of reliance includes an examination of whether the party asserting estoppel had the right to rely on the representations made. In Belveal [State, Dept. of Health and Rehabilitative Services v. Law Offices of Donald W. Belveal, 663 So.2d 650 (Fla. 2nd DCA 1995)], for example, the Second District noted that “[t]here must be clear and convincing evidence of a ‘positive act on the part of some officer of the state upon which the aggrieved party had a right to rely and did rely to its detriment.’ [citations omitted] ... In this case, the Law Office did rely, to its detriment, on the unwritten words of HRS employees. It had no right, however, to rely upon this oral representation.” Belveal, at 653; see also Greenhut Construction Company, Inc. v. Henry A. Knott, Inc., 247 So.2d 517 (Fla. 1st DCA 1971). In another refinement of this concept, the Fourth District Court of Appeal cited Heckler v. Community Health Services of Crawford County, Inc., [467 U.S. 51,] 104 S.Ct. 2218[, 81 L.Ed.2d 42] (1984), as follows:
[T]he Supreme Court stated “[w]hen a private party is deprived of something to which it was entitled as a right, it surely has suffered a detrimental change in its position.” Id. [at 2225]. However, the Court found no detrimental change in position occurred where the only harm was the inability to retain money which should have never been received in the first place ... Heckler controls the situation presented by the instant case. Lewis has no vested right to retain the incorrectly paid benefits and therefore HRS should not be precluded from following its regulatory scheme to recover overpayments.
Lewis v. State Department of Health and Rehabilitative Services, 659 So.2d 1255, 1257 (Fla. 4th DCA 1995). In the circumstances at issue here, the Court must also conclude that AIIC had no right to rely on any legislative negotiations or DLES representations about whether retroactive assessments for ceded premium deductions for the year 2000 would be made.
These principles apply with equal force to the estoppel asserted as to AIIC’s deductions based on brokerage fees and commissions. As to these deductions, too, AIIC failed to prove “serious injustice” or lack of undue harm to the public interest, nor did AIIC prove justified, detrimental reliance on any misrepresentation of fact.
*1257 Testimony at trial indicated that AIIC was one of a very small group of carriers (perhaps five to seven per cent) that took a deduction for brokerage fees and commissions; it was by no means the common practice for workers’ compensation carriers to take such a deduction. No statute provides a deduction for brokerage fees and commissions or defines net premiums to exclude brokerage fees and commissions.[3] As a factual matter, moreover, AIIC failed to prove it relied on representations by employees of the Department that it could take a deduction for brokerage fees and commissions.
In this regard, AIIC contends it relied on assurances a departmental employee named Tina Green gave to Andy Gray, an independent accountant who worked for AIIC, Riscorp, and others, that it was permissible to take a deduction for brokerage fees and commissions.[4] Dan McGar-vey, AIIC’s chief financial officer at the time of trial, testified that AIIC began taking the deduction for brokerage fees and commissions in late 1999 because Andy Gray told AIIC that departmental personnel had told him it was appropriate to take the deduction. Andy Gray testified, confirming that he relayed information about taking the deduction to David Yon in February or March of 1999, when Mr. Yon was AIIC’s chief financial officer. But he testified that, at the same time he told David Yon what Tina Green had said, he also told him about a letter Ed Dion, then the Department’s general counsel, had written denying another carrier’s request for a refund based on brokerage fees and commissions.[5]
*1258 Before the year 2000 began, therefore, AIIC was aware, according to uncontra-dicted evidence, that the Department’s general counsel had given his opinion in writing that no deduction for brokerage fees and commissions was permissible under the statute. AIIC never sought a declaratory statement or availed itself of any of the Administrative Procedure Act’s “impressive arsenal of varied and abundant remedies for administrative error,” State ex rel. Dep’t of Gen. Servs. v. Willis, 344 So.2d 580, 590 (Fla. 1st DCA 1977), to challenge the general counsel’s opinion.
For a more fundamental reason, too, AIIC was not justified in relying on departmental employees’ informal views concerning the propriety of the deduction. Such views were legal opinions, not factual representations. See State Dep’t of Revenue v. Anderson, 403 So.2d 397, 400 (Fla.1981). See also Branca v. City of Miramar, 634 So.2d 604, 606 (Fla.1994) (stating that “a governmental entity may not be estopped through mistaken statements of the law”); Dolphin Outdoor Adver. v. Dep’t of Transp., 582 So.2d 709, 710-11 (Fla. 1st DCA 1991) (stating that estoppel does not lie against the government based on governmental employees’ misstatements of purely legal views).[6] Otherwise, a single misinformed executive branch employee could effectively eviscerate legislation long after time for the exercise of any veto had expired.
This case differs from Kuge v. Florida Department of Administration, 449 So.2d 389 (Fla. 3d DCA 1984), where a state employee contemplating retirement contacted the Department of Administration’s Division of Retirement. The Division audited her account and informed her in writing that she had 9.58 years of credit, and that she had to work only through March of 1983 at her current salary to receive retirement benefits in a stated amount. Relying on this misinformation, she continued working until March 31, 1983, at which time she left the state’s employ and took another job, only to be refused retirement benefits altogether because, the Division announced, it had erred in its earlier calculations, giving her credit for time she was not entitled to under applicable law. See id. at 390. Eventually the Third District ruled the Division es-topped from denying Ms. Kuge benefits, rejecting the idea that the Division had misrepresented law instead of fact. See also Branca, 634 So.2d at 606 (holding that “Branca relied upon the fact that ordinance 88-16 had been duly enacted”). The Kuge court stated, “It is true that such representations were based on a misunderstanding of the law applicable to her case, but this does not convert the factual representations into legal representations,” id. at 391-92, finding it determinative that, while the Division told Ms. Kuge how many creditable years she had as a matter of fact, “she was in no way advised as to the status of Florida law,” id. at 392, on the point.
*1259 The present ease involves an explicit interpretation of law, not a representation of fact. Discussions concerned the statutory definition of “net premiums” and whether deductions were permitted under the statute. All the representations at issue explicitly interpreted the statute and had to do with whether “net premiums” should be understood to include brokerage fees, commissions and ceded premiums. No “fact” was represented other than an interpretation of the statute. Under the cases, AIIC would not have been justified in relying on Tina Green’s legal opinion even if the general counsel had not repudiated her views. See Branca, 634 So.2d at 606 (“[A] governmental entity may not be estopped through mistaken statements of the law_”); Anderson, 403 So.2d at 400 (“[The] general rule is that the state cannot be estopped through mistaken statements of the law.”); see also Dolphin, 582 So.2d at 711; Hobbs, 368 So.2d at 369 (citing cases).
Accordingly, we affirm on the main appeal, reverse on the cross-appeal, and remand for further proceedings consistent with this opinion.
BARFIELD and WEBSTER, JJ., CONCUR.

. Workers' compensation carriers are still required by statute to pay assessments into two trust funds, the Special Disability Trust Fund (SDTF) and the Workers' Compensation Administration Trust Fund (WCATF), pursuant to sections 440.49 and 440.51, Florida Statutes. See § 440.49(9)(b)(l.), Fla. Stat. (2005); § 440.5l(l)(b), Fla. Stat. (2005). Insurance companies are assessed for contributions to the SDTF based on the amount of "net premiums written,” and companies are assessed for contributions to the WCATF on the amount of "net premiums collected.” § 440.49(9)(b)(2.)-(3.), Fla. Stat. (2005); § 440.51(l)(b), Fla. Stat. (2005).

. We held in Florida Department of Financial Services v. RISCORP Insurance Co., 871 So.2d 261, 262 (Fla. 1st DCA 2004), "that the term 'net premiums collected,’ as contained in section 440.51, Florida Statutes, and the term 'net premiums written,’ as contained in section 440.49, Florida Statutes, include ceded reinsurance premiums,” and that no deduction for ceded reinsurance premiums was allowable.

. The narrow holding in RISCORP, 871 So.2d 261, does not decide the propriety of the brokerage fees and commissions deduction in the present case, and AIIC does not contend otherwise. The RISCORP court held simply that the trial court there did not err in deciding that the Department had waited too long before seeking leave to amend its answer and to be relieved of answers to requests for admissions:
We affirm the final judgments to the extent that appellees’ refunds are attributable to brokerage fees and commissions without further discussion. We also affirm the trial court's denial of DLES's Motion to Amend Answer and to Withdraw Certain Responses to Admissions Requests without further discussion.
Id. at 262. See also id. at 266 (Webster, J., concurring) ("I also agree that the trial court did not abuse its discretion in denying appellants’ motions to withdraw admissions and to amend their answers. Accordingly, based on those admissions and answers, I agree, further, that the portions of the final judgments holding that appellees are entitled to refunds must be affirmed to the extent those refunds are attributable to deductions for brokerage fees and commissions.”).

. But Mr. Shebel, AIIC’s chief executive officer, testified that AIIC had taken this deduction "all along.” Because Mr. Shebel testified that no one told him AIIC was authorized to deduct brokerage fees and commissions, his testimony lends no support to AIIC's equitable estoppel claim.

.Neither Tina Green nor David Yon testified. Mr. Gray testified he had also communicated with another departmental employee, Paul Wotherspoon, who shared Ms. Green’s views, but he did not testify that he invoked Mr. Wotherspoon’s name in discussing the matter with anybody at AIIC.
Mr. Gray testified on direct as follows:
Q And despite that and despite the refund denial, you continued to take your counsel from the lowest-level division employee on an oral basis, ignoring the written material you received from the general counsel's office and the division director who signed the denial letter in Riscorp.; is that correct?
A Yeah. And based on discussions with those same people after Mr. Dion was reassigned.
Q And did you ever get a letter from the new general counsel after Mr. Dion was reassigned countermanding Mr. Dion’s January 15, 1999 letter?
A Did not.
Mr. Dion’s tenure as general counsel came to an end on March 31, 1999.

. Dolphin arose when an advertiser applied to the Department of Transportation (DOT) for a permit to erect a billboard. 582 So.2d at 710. DOT's sign inspector erroneously thought the law required that billboards be only 1000 feet apart, when they were actually supposed to be 1500 feet apart, and Dolphin's permit was approved. Dolphin entered into a lease for the property, paid for the permit, and entered into a three-year advertising contract. A month later, DOT advised Dolphin that the permits were not valid because they had been issued in error. After a hearing under section 120.57, Florida Statutes, DOT denied relief. On appeal, we reversed, holding that DOT’s misrepresentation was a mistake of fact, not of law: "we conclude that the representation by DOT's agent that the proposed location met the spacing requirements was based on a misunderstanding of the law, but ... 'this does not convert the factual representations into legal representations.' "Id. at 711.