# Third District Court of Appeal

## State of Florida

Opinion filed June 17, 2026.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D25-0363
Lower Tribunal No. 23-18115-CA-01
_____

**City of Doral, City of Doral City Elected Officials Retirement Plan, and Administrative Committee, City of Doral City Elected Officials Retirement Plan,**
Appellants,

vs.

**Pedro Cabrera, Sandra Ruiz, Juan Carlos Bermudez, and Michael DiPietro,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, William Thomas, Judge.

Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., and Hudson C. Gill and Christopher J. Stearns (Fort Lauderdale), for appellants.

Sugarman, Susskind, Braswell & Herrera, P.A., and D. Marcus Braswell, Jr., Pedro A. Herrera, and Veronica Ucros, for appellees.

Before FERNANDEZ, GORDO and GOODEN, JJ.

GOODEN, J.

This appeal stems from the City of Doral's decision to enact, and subsequently repeal, a retirement system for its elected officials. When the City terminated the program, four former officials—who were already receiving benefits—filed a legal challenge. The trial court sided with the officials, concluding that the City lacked the authority to terminate those vested benefits. While the City has raised several issues, we write to address only the merits claim. For the reasons stated below, we affirm the judgment in part and reverse in part.

## I.

In 2021, the City of Doral adopted Ordinance 2021-02 by a four to one vote. Its title provided:

> **AN ORDINANCE OF THE MAYOR AND THE CITY COUNCIL OF THE CITY OF DORAL, FLORIDA, ESTABLISHING A RETIREMENT SYSTEM FOR ELECTED OFFICIALS OF THE CITY OF DORAL THAT HAVE SERVED A MINIMUM OF EIGHT YEARS; PROVIDING FOR AN ADMINISTRATIVE COMMITTEE; PROVIDING FOR A SEVERABILITY CLAUSE; PROVIDING FOR CONFLICTS AND PROVIDING FOR AN EFFECTIVE DATE**

In addition to life and health insurance, the retirement system provided the following pension benefits:

(i)    Any elected official who has served two full terms of office or for a period of eight years and who has reached the Retirement age and no longer serves as an elected official

2

in the City of Doral and applies for benefits, shall be entitled during the remainder of his/her natural life to an annual pension benefit equal to fifty percent (50%) of the elected official's compensation. The Elected Official compensation shall equal the average of the last three years of compensation or his/her term of office. Upon vesting and each year of service as an elected officer thereafter, the retirement benefit shall increase by twelve and one-half percent (12.5%) for each additional year of service.

It further established an administrative committee to administer the plan. The ordinance became effective immediately after the second reading on February 10, 2021.

Thereafter, the City established a pension fund from general revenue and made an initial contribution to the fund. It further entered into a custodial agreement with Regions Bank to hold plan assets in trust and make monthly pension payments to beneficiaries. The City Council adopted an investment policy and made additional contributions in the following years. See Art. X, § 14, Fla. Const. (1976).

But in 2023, members of the council questioned the soundness of the retirement plan. So the City retained an outside law firm to evaluate the validity of the ordinance, its funding, and its administration.[1] Outside counsel

---

[1] The resolution to retain outside counsel stated: "on February 10, 2021, the City of Doral (the 'City') adopted Ordinance 2021-02, establishing a retirement system for former, current, and future elected officials (the 'Ordinance') . . . ." See City of Doral Resolution, 23-4983 (Feb. 8, 2023).

identified compliance issues and recommended engaging a new actuary and obtaining an opinion from the Department of Management Services. Although the City could have brought the plan into compliance and could have sought other guidance, it chose not to.

Rather, on May 1, 2023, in a seven-minute meeting, the administrative committee voted to stop disbursing pension payments and benefits under the plan. About a week later, the City enacted Ordinance 2023-15 by a three to two vote. Its title stated:

> **AN ORDINANCE OF THE MAYOR AND THE CITY COUNCIL OF THE CITY OF DORAL, FLORIDA, REPEALING ORDINANCE No. 2021-02 RETROACTIVE TO THE DATE OF ITS ADOPTION; REPEALING ARTICLE IX, "RETIREMENT SYSTEM FOR ELECTED OFFICIALS," OF CHAPTER 2, OF THE CITY OF DORAL CODE OF ORDINANCES; PROVIDING FOR SEVERABILITY; REPEALING ALL ORDINANCES OR PARTS OF ORDINANCES IN CONFLICT; AND PROVIDING FOR AN EFFECTIVE DATE**

The Whereas clauses were incorporated into the ordinance. Pertinent here are:

> **WHEREAS**, the Ordinance provides lifetime pension, health, and life insurance benefits for elected officials who have served at least 8 years or 2 full terms in office, are no longer serving as an elected official and attain age 60, and
> . . .
>
> **WHEREAS**, the Report further concluded that the payment of benefits under the Plan to former elected officials who left office before the Plan was in effect violates Section 215.425(1), Florida Statutes, which provides that "[n]o extra compensation shall be

4

made to any officer, agent, employee, or contractor after the service has been rendered or the contract made"; and

The ordinance repealed the initial ordinance "retroactive to the date of its adoption, to-wit: February 10, 2021." It was to become effective ten days after the second reading on June 14, 2023. All beneficiaries were notified that they would no longer receive benefits.

But the day before repeal, four former elected officials who had been receiving benefits under the retirement plan filed suit for declaratory relief. The four former elected officials are:

- **Appellee Pete Cabrera**: served on the council from 2003 to 2012 and again from 2014 to 2022. Cabrera was vice mayor when the initial ordinance was enacted and voted for the ordinance. He left service after the ordinance went into effect. He began receiving benefits in February 2023.

- **Appellee Sandra Ruiz**: served on the council from 2003 to 2010 and again from 2012 to 2016. She is a former vice mayor. She left service before the ordinance went into effect. She began receiving benefits in February 2022.

- **Appellee Juan Carlos Bermudez**: served as mayor from 2003 to 2012 and again from 2016 to 2022. He was mayor when the initial ordinance was enacted and voted for the ordinance. He left service

after the ordinance went into effect.  He started receiving benefits in February 2023.

- **Appellee Michael DiPietro**: served on the council from 2003 to 2012. He is a former vice mayor.  He left service before the ordinance went into effect.  He started receiving benefits in December 2021.

The former officials sought a declaration that they have vested rights protected by Art. I, section 10, Florida Constitution, and the City infringed on those vested rights.  They sought continuation of benefits payments, along with unpaid benefits due with interest.

The City maintained that it had legal authority to repeal the pension ordinance.  It also asserted that the four former officials had not vested because they did not serve eight years <u>after</u> the adoption of the ordinance. Lastly, it argued that providing the benefits would constitute extra compensation under section 215.425, Florida Statutes, which the City is prohibited from providing.

Both parties moved for summary judgment.  The trial court granted the former officials' motion, and denied the City's.  The trial court declared that the former officials had vested rights to retirement benefits under the

ordinance.[2]  Any repeal violated Art. I, section 10, Florida Constitution.  It ruled that the City was equitably estopped from terminating those vested benefits.  It then explained that the former officials were entitled to continuation of vested benefits, payment of unpaid benefits with interest, costs, and attorney's fees.  The trial court entered final judgment accordingly.  This appeal follows.

## II.

Our review of the issues before us is de novo.  See Bionetics Corp. v. Kenniasty, 69 So. 3d 943, 947 (Fla. 2011) (applying a de novo standard to "[t]he question of whether a statute applies retroactively or prospectively"); Siegel v. Tower Hill Signature Ins. Co., 225 So. 3d 974, 976 (Fla. 3d DCA 2017) ("We review the trial court's orders granting final summary judgment de novo."); Martinez v. Hernandez, 227 So. 3d 1257, 1259 (Fla. 3d DCA 2017) ("Additionally, the standard of appellate review with respect to the interpretation of a charter or ordinance is de novo.").

## III.

---

[2] The order noted that the "parties both agreed that while the City does have the authority to properly repeal an ordinance or amend a pension plan prospectively for non-vested benefits, the City's authority does not extend to legislative actions which infringe upon vested pension rights, as vested pension rights are constitutionally protected under Article I, Section 10, of the Florida Constitution."

7

The Constitution of our State was ordained and established to ensure ordered liberty.  Boynton v. State, 64 So. 2d 536, 552 (Fla. 1953); Whitaker v. Parsons, 86 So. 247, 250 (Fla. 1920).  It begins "with a Declaration of Rights—a series of rights so basic that the framers of our Constitution accorded them a place of special privilege." Traylor v. State, 596 So. 2d 957, 963 (Fla. 1992).  See also State v. City of Stuart, 120 So. 335, 347 (Fla. 1929) ("Primacy of position in our State Constitution is accorded to the Declaration of Rights. . . .  These Declarations of Rights . . . have cost much, and breathe the spirit of that sturdy and self-reliant philosophy of individualism which underlies and supports our entire system of government.").  "Each right is, in fact, a distinct freedom guaranteed to each Floridian against government intrusion.  Each right operates in favor of the individual, against government." Traylor, 596 So. 2d at 963.

The liberty of contract is one such right.  Citrus Cnty. Hosp. Bd. v. Citrus Mem'l Health Found., Inc., 150 So. 3d 1102, 1106 (Fla. 2014).  It is "one of the most sacrosanct rights guaranteed by our fundamental law." Chiles v. United Fac. of Fla., 615 So. 2d 671, 673 (Fla. 1993).  See also In re Advisory Op. to the Governor, 509 So. 2d 292, 314 (Fla. 1987) ("It is equally indisputable . . . that rights existing under a valid contract enjoy protection under the Florida Constitution.").  Indeed, Floridians have exalted

this right and continuously placed it in their Constitutions since 1838.  See Art. I, § 19, Fla. Const. (1838); Art. I, § 19, Fla. Const. (1861); Art. I, § 19, Fla. Const. (1865); Decl. of Rights, § 16, Fla. Const. (1868); Decl. of Rights, § 17, Fla. Const. (1885); Art. I, § 10, Fla. Const. (1968).   Our present Constitution provides that no "law impairing the obligation of contracts shall be passed."  Art. I, § 10, Fla. Const. (1968).

"To impair a preexisting contract, a law must have the effect of rewriting antecedent contracts in a manner that changes the substantive rights of the parties to existing contracts." Searcy, Denney, Scarola, Barnhart & Shipley, etc. v. State, 209 So. 3d 1181, 1191 (Fla. 2017) (citation modified).  Total obliteration of contractual rights is unnecessary.  U.S. Fid. & Guar. Co. v. Dep't of Ins., 453 So. 2d 1355, 1360 (Fla. 1984).  Rather, "[t]o 'impair' has been defined as meaning to make worse; to diminish in quantity, value, excellency, or strength; to lessen in power; to weaken.  Whatever legislation lessens the efficacy of the means of enforcement of the obligation is an impairment." State ex rel. Woman's Ben. Ass'n v. Port of Palm Beach Dist., 164 So. 851, 856 (Fla. 1935).  And so, "[v]irtually no degree of contract impairment has been tolerated in this state." Yamaha Parts Distribs. Inc. v. Ehrman, 316 So. 2d 557, 559 (Fla. 1975).  See also Pomponio v. Claridge of Pompano Condo., Inc., 378 So. 2d 774, 780 (Fla. 1979).

9

To make that determination here, we must examine whether the former officials have vested rights in the pension. Trs. of Internal Improvement Fund v. Bailey, 10 Fla. 112, 130 (Fla. 1862) ("When then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot divest those rights.") (citing Fletcher v. Peck, 10 U.S. 87, 135 (1810)); State ex rel. O'Donald v. City of Jacksonville Beach, 142 So. 2d 349, 351 (Fla. 1st DCA 1962), aff'd, 151 So. 2d 430 (Fla. 1963) ("The controlling question presented for our decision is whether under the facts of this case appellant widow acquired a vested right of contract to pension benefits provided by the law in effect at the time of her husband's retirement, and if so, whether the amendatory act of 1951 impairs the obligations of that contract."). See generally Douglas W. Kmiec & John O. McGinnis, The Contract Clause: A Return to the Original Understanding, 14 Hastings Const. L.Q. 525, 526 (1987) ("Correctly interpreted, the Contract Clause prohibits all retrospective, redistributive legislation which violates vested contractual rights by transferring all or part of the benefit of a bargain from one contracting party to another."). "A vested right has been defined as an immediate, fixed right of present or future enjoyment and also as an immediate right of present enjoyment, or a present, fixed right of future enjoyment." City of Sanford v. McClelland, 163 So. 513, 514–15 (Fla. 1935)

10

(citation modified). "To be vested a right must be more than a mere expectation based on an anticipation of the continuance of an existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand." Clausell v. Hobart Corp., 515 So. 2d 1275, 1276 (Fla. 1987) (citing Div. of Workers' Comp. v. Brevda, 420 So. 2d 887, 891 (Fla. 1st DCA 1982)) (emphasis omitted). If vested, "[t]he contractual relationship may not thereafter be affected or adversely altered by subsequent statutory enactments." Fla. Sheriffs Ass'n v. Dep't of Admin., Div. of Ret., 408 So. 2d 1033, 1036 (Fla. 1981). See also State ex rel. Stringer v. Lee, 2 So. 2d 127, 132 (Fla. 1941) ("The inchoate right becomes a complete vested right when the conditions connected with the particular retirement system are complied with. This right cannot be thereafter disturbed by legislation.").

The parties disagree as to whether the former officials have vested rights. The former officials maintain that they do. They point to the language of the ordinance and the fact that they have been receiving benefits. By contrast, without engaging in the language of the ordinance, the City claims such a finding is precluded by principles against retroactive application of the law and section 215.425, Florida Statutes. In sum, its position is that the former officials' service must occur after enactment to qualify.

11

## A.

In our quest to arrive at a fair reading, we start our analysis with the text of Ordinance 2021-02. Ham v. Portfolio Recovery Assocs., LLC, 308 So. 3d 942, 946 (Fla. 2020). Starting with its title, it established "a retirement system for elected officials of the City of Doral that have served a minimum of eight years." See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 221 (2012) ("The . . . headings are permissible indicators of meaning."). The ordinance contained a definition section. It defined beneficiary as "any person receiving a benefit from the retirement system provided by this article." Elected official meant "any person who was elected in a general or special election to serve as mayor or as a city council member." Service signified "the period of time served as the mayor or city council member." Retirement age meant "the first day of the month coincident with or next following the 60th anniversary of birth." Vesting was defined as "the vesting of rights to future benefits after eight years of Service . . . ."

In the section setting forth what benefits the elected official receive, it stated: "Any elected official who has served two full terms of office or for a period of eight years and who has reached the Retirement age and no longer serves as an elected official in the City of Doral and applies for benefits, shall

12

be entitled during the remainder of his/her natural life to an annual pension benefit equal to fifty percent (50%) of the elected official's compensation." It further provides: "A vested elected official, that no longer serves as an elected official in the City of Doral who has served for a period of eight years and who has reached the Retirement age and no longer serves as an elected official in the City of Doral shall be entitled during the remainder of his/her natural life to a credit towards the health insurance premium . . . ." It provided certain death benefits: "The City will maintain a life insurance policy for elected officials in the same amount as the policy maintained during their last year of service who have served for a period of eight years in the City of Doral."

In the next section, the ordinance sets out how the system will be administered. It established an administrative committee who determines "all questions relating to eligibility and participation," and "receive[s] and process[es] all applications for participation and benefits," among other duties. The ordinance became effective immediately after the second reading on February 10, 2021.

The City's verb tense throughout the ordinance is significant. See United States v. Wilson, 503 U.S. 329, 333 (1992). Different tenses are used to distinguish between what is (i.e., present tense for definitions), what has

13

happened (i.e., present perfect tense for eligibility), and what must happen (i.e., future tense for mandates and administration). This shows "its knowledge of the significance and meaning of the language it employed." Dean Wish, LLC v. Lee Cnty., 326 So. 3d 840, 847 (Fla. 2d DCA 2021) (citation omitted).

A key consideration here is the use of the present perfect tense to determine eligibility—have served, was elected, has served, has reached, has vested. See Brito v. Salas, 51 Fla. L. Weekly S12, at *6 (Fla. Dec. 30, 2025) ("Courts are to interpret statutes consistent with rules of grammar."); Scalia & Garner, supra, at 140 ("Words are to be given the meaning that proper grammar and usage would assign them."). Use of the present perfect tense in this context describes actions that must be completed before a right is granted. See The Chicago Manual of Style § 5.132, at 268 (17th ed. 2017) ("The present-perfect tense . . . denotes an act, state, or condition that is now completed or continues up to the present."); Bryan A. Garner, Garner's Modern English Usage 896–97 (4th ed. 2016) (denoting "an action having been completed at some indefinite time in the past," and signifies "imprecision of time"); Rodney Huddleston & Geoffrey K. Pullum, The Cambridge Grammar of the English Language 143 (2002) (confirming present-perfect tense addresses "a time-span beginning in the past and

14

extending up to now"); Present perfect, <u>American Heritage Dictionary of the English Language</u> (5th ed. 2018) ("The verb tense expressing action completed at the present time, formed in English by combining the present tense of *have* with a past participle"). It serves as a condition precedent. <u>See</u> Bryan A. Garner, <u>The Art of Boiling Down: James Fitzjames Stephen As Drafter & Lexicographer</u>, 9 Green Bag 2d 27, 31 (2005) ("Hence the wise drafter uses the present tense for all facts and conditions required to be concurrent with the operation of the legal action, and the present perfect tense to express all facts and conditions required as being precedent to a legal action."); <u>see also</u> George Coode, <u>On Legislative Expression: Or, The Language of The Written Law</u> 63–64 (1845). It bridges the past (i.e., service) with the present (i.e., eligibility).

A fair reading of the ordinance simply does not require the service to occur after the ordinance was enacted. By using present perfect tense, the City omitted any temporal restriction to the service requirements. <u>See</u> <u>Murphy v. Murphy</u>, 342 So. 3d 799, 804–05 (Fla. 1st DCA 2022) ("If the Legislature had intended to allow prior conduct (*i.e.*, activity that started and ended in the past) to support jurisdiction over a nonresident, it would have used a past tense of the being verb (*i.e.*, '*was* engaged') or a perfect tense

(*i.e.*, '*has* engaged' or '*had* engaged').").  Thus, prior service supports present eligibility.

This conclusion is reinforced by other contextual clues.  <u>Alachua Cnty. v. Watson</u>, 333 So. 3d 162, 169 (Fla. 2022).  For instance, the City passed a resolution to retain outside counsel in 2023.  That resolution incorporated a whereas clause stating: "on February 10, 2021, the City of Doral (the 'City') adopted Ordinance 2021-02, establishing a retirement system for former, current, and future elected officials (the 'Ordinance') . . . ."  <u>See</u> City of Doral Resolution, 23-4983 (Feb. 8, 2023).  This was done two years after the enactment of the original ordinance and expressly references "former" officials.  Since the ordinance requires eight years of service, the "former" officials in question would have necessarily served before the act was passed.  This undercuts the City's interpretation—that all service must occur <u>after</u> enactment of the initial ordnance.

Likewise, the retirement system's administrative committee determines who is vested and eligible to receive pension benefits.  This committee processed the applications of these former officials and determined that they were eligible to receive benefits.  And the former officials started to receive those benefits.  To that end, the committee found prior service fell within the text of the ordinance.

16

The City claims that this results in a retroactive application of the ordinance. Not so. This is because "[r]etroactivity ought to be judged with regard to the act or event that the [ordinance] is meant to regulate." Scalia & Garner, supra, at 263. That event here is creation of the retirement system—not regulation of prior public service. Thus, the ordinance is prospective in nature. It made law for the future.

**B.**

Next, the City turns to section 215.425, Florida Statutes. It asserts that awarding pension benefits to the former officials violates this statute as it is extra compensation for services already rendered.[3] Yet the former officials contend that pensions are not "extra compensation." According to them, only bonuses and severance payments qualify. We must determine what "extra compensation" means.

The language of this statute was first found in our 1885 Constitution. Art. XVI, § 11, Fla. Const. (1885). It provided: "No extra compensation shall be made to any officer, agent, employee, or contractor after the service shall have been rendered, or the contract made; nor shall any money be appropriated or paid on any claim, the subject matter of which shall not have

---

[3] The City further argues on appeal that violation of the statute renders the ordinance void. Still, that argument was not made below and therefore, not preserved for appeal. We will not address it in the first instance.

been provided for by pre-existing laws, unless such compensation or claim be allowed by bill passed by two-thirds of the members elected to each house of the Legislature." Id.

In 1968, Florida moved several provisions from its Constitution into general law. Art. XII, § 10, Fla. Const. (1968). This is one such provision. Kirk v. Brantley, 228 So. 2d 278, 279–80 (Fla. 1969).

While the statute went through a series of amendments, this language remained largely untouched. See Ch. 79-190, § 27, Laws of Fla.; Ch. 80-114, § 1, Laws of Fla.; Ch. 84-336, § 35, Laws of Fla.; Ch. 92-90, § 3, Laws of Fla.; Ch. 92-279, § 83, Laws of Fla.; Ch. 92-326, § 55, Laws of Fla.; Ch. 95-169, § 2, Laws of Fla.; Ch. 98-320, § 5, Laws of Fla.; Ch. 99-259, § 8, Laws of Fla.; Ch. 2011-143, § 1, Laws of Fla.; Ch. 2012-5, § 24, Laws of Fla.; Ch. 2014-218, § 44, Laws of Fla. Except for minor grammatical changes, the only change to this specific language was in 1995 when the Legislature changed "bill passed" to "a law enacted." Ch. 95-169, § 2, Laws of Fla. Accordingly, the present language reads:

> No extra compensation shall be made to any officer, agent, employee, or contractor after the service has been rendered or the contract made; nor shall any money be appropriated or paid on any claim the subject matter of which has not been provided for by preexisting laws, unless such compensation or claim is allowed by a law enacted by two-thirds of the members elected to each house of the Legislature.

18

§ 215.425(1), Fla. Stat. (2021).  The other provisions address bonuses and severance pay and nondisclosure agreements.  Id. at (2)–(5).

To discern the meaning of language, we must analyze the original public meaning of the text from when it was adopted.  Planned Parenthood of Sw. & Cent. Fla. v. State, 384 So. 3d 67, 77 (Fla. 2024); City of Jacksonville v. Cont'l Can Co., 151 So. 488, 489–90 (Fla. 1933).  "This task—to arrive at the terms of the bargain by looking to the meaning ascribed to the words that embody the deal at the time it was struck—keeps us from pouring new wine into old wineskins, with predictable results."  Tomlinson v. State, 369 So. 3d 1142, 1146 (Fla. 2023).  But this textual history presents an interesting question.  Which period governs the original public meaning of the term "extra compensation": 1885 or 1968?

We believe the 1885 original public meaning controls unless there is some indication to the contrary.[4]  See generally In re Advisory Op. to the Governor, 112 So. 2d 843, 847 (Fla. 1959) ("[T]he construction of an old Constitution still applies to a new Constitution if the wording is the same . . . ."); Swartz v. State, 316 So. 2d 618, 621 (Fla. 1st DCA 1975) ("It is generally presumed that the construction of an old constitution continues to be

---

[4] See generally Nels S.D. Peterson, Principles of Georgia Constitutional Interpretation, 75 Mercer L. Rev. 1, 12–14 (2023) (discussing the presumption of constitutional continuity).

19

applicable to a new one if the language is the same . . . ."); Scalia & Garner,

supra, at 78 ("Words must be given the meaning they had when the text was

adopted."); Jason Mazzone & Cem Tecimer, Interconstitutionalism, 132 Yale

L.J. 326, 339 (2022) ("[M]eaning is fixed at the time a provision first appeared

in a polity's charter. On this view, evidence from the moment of repetition

matters relatively little.").  And so, we must analyze both time periods here.

**i.**

To understand the 1885 Constitution, we need to first discuss the 1868

Constitution.  In 1867, Congress declared that no legal government existed

in Florida and placed it under military control.  Act of Mar. 2, 1867, ch. 153,

14 Stat. 428 (1867).  To be readmitted, Florida was required to establish a

Constitution that conformed to the U.S. Constitution and to adopt the

Fourteenth Amendment.  Id.  The 1868 Constitution was the result of these

efforts.  Act of June 25, 1868, ch. 70, 15 Stat. 73 (1868).

This Constitution centralized authority and gave the Governor

immense power.  He was authorized to appoint most state and local officials,

which reduced any local control over county government.  Art. V, § 19,  Fla.

Const. (1868).  This led to intense political opposition, allegations of political

corruption and misuse of public funds, and even attempts to impeach

20

Governor Harrison Reed.[5]  See generally Op. of Justices, 12 Fla. 653, 653 (1868); In re Op. of Justices, 14 Fla. 289, 289 (1872).

Our 1885 Constitution was a direct reaction to the 1868 Constitution. It "created a new system with a weak Governor."  Talbot "Sandy" D'Alemberte, The 1997-98 Constitution Revision Commission: Reflections and Commentary from the Commission's First Chairman, 25 Fla. St. U.L. Rev. 19, 20 (1997).  See also Deborah K. Kearney, The Florida Cabinet in the Age of Aquarius, 52 Fla. L. Rev. 425, 434 (2000) ("The Constitution of 1885 was a clear response to the carpetbag constitution and its disarming level of executive power which, to add to the insult of military control, had all too often been exercised in an incompetent and corrupt manner."); Thomas Graham, The First Developers, in The History of Florida 283–84 (Michael Gannon ed., 1996).  It emphasized fiscal responsibility, placing many restrictions on "fiscal powers."  Manning J. Dauer & William C. Havard, The

---

[5]  See also Richard Keith Call, 1868-1872: Pages Concerning the Impeachment of Governor Harrison Reed, State Archives of Florida, Florida Memory, https://www.floridamemory.com/items/show/267522 (last visited May 3, 2026); Letters Relating to the Efforts to Impeach Governor Harrison Reed During the Reconstruction Era, The Florida Memory Project, https://web.archive.org/web/20051018171639/http://www.floridamemory.com/FloridaHighlights/governorharrison/governorharrison.cfm (last visited May 2, 2026); Cortez A. M. Ewing, Florida Reconstruction Impeachments: 1. Impeachment of Governor Harrison, 36 Fla. Hist. Q. no. 4, at 299–318 (Apr. 1958).

Florida Constitution of 1885—A Critique, 8 Fla. L. Rev. 1, 6 (1955). These fiscal restrictions are tied to the desire to curb that corruption and safeguard public funds. See State ex rel. W. v. Gray, 74 So. 2d 114, 117 (Fla. 1954) ("But it is known that, at that time, the people were just emerging from the reconstruction period following the War Between the States; they still bore the scars of the Carpetbag Rule; the memories of the political abuses suffered thereunder were still fresh in their minds; and we can well surmise that they intended to prohibit the 'trafficking' in public offices, both elective and appointive, from which they had suffered during that regime.").

The language in the 1885 Constitution does not specify what qualifies as "extra compensation." Art. XVI, § 11, Fla. Const. (1885). At the 1885 Constitutional Convention, it does not appear there was much discussion about this provision. This section was read and simply passed without amendment. See Journal of the Proceedings of the Constitutional Convention of the State of Florida 370, 452–59, 482 (1885).

Yet this was a common provision in state constitutions of this era. See, e.g., Art. 4, § 21, Mich. Const. (1850) ("The legislature shall not grant nor authorize extra compensation to any public officer, agent or contractor, after the service has been rendered or the contract entered into."); Art. III, § 28, N.Y. Const. (1894) ("The Legislature shall not, nor shall the common council

of any city, nor any board of supervisors, grant any extra compensation to any public officer, servant, agent or contractor."); Art. 3, § 11, Pa. Const. (1874) ("No bill shall be passed giving any extra compensation to any public officer, servant, employee, agent or contractor, after services shall have been rendered or contract made, nor providing for the payment of any claim against the commonwealth without previous authority of law."); Art. III, § 30, S.C. Const. (1895) ("The General Assembly shall never grant extra compensation, fee or allowance to any public officer, agent, servant or contractor after service rendered, or contract made, nor authorize payment or part payment of any claim under any contract not authorized by law; but appropriations may be made for expenditures in repelling invasion, preventing or suppressing insurrection."); Art. III, § 44, Tex. Const. (1876) ("The Legislature shall provide by law for the compensation of all officers, servants, agents and public contractors, not provided for in this Constitution, but shall not grant extra compensation to any officer, agent, servant, or public contractors, after such public service shall have been performed or contract entered into, for the performance of the same;"); Art. II, § 25, Wash. Const. (1889) ("The Legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor, after the services shall have been rendered, or the contract entered into, nor shall the compensation of any

23

public officer be increased or diminished during his term of office."); Art. IV, § 26, Wis. Const. (1848) ("The legislature shall never grant any extra compensation to any public officer, agent, servant, or contractor after the services shall have been rendered or the contract entered into. Nor shall the compensation of any public officer be increased or diminished during his term of office."). See also Frederic Jesup Stimson, The Law of the Federal and State Constitutions of the United States, § 214, p. 208 n.4 (1908) (including list of states' constitutional provisions). But these states, likewise, did not have much debate on these provisions. See State ex rel. Thomson v. Giessel, 53 N.W.2d 726, 734 (Wis. 1952) (Currie, J., dissenting).

There is one exception—Utah. At its constitutional convention in 1895, the framers discussed that the provision is to prevent public officials and public contractors from making a low bid or agreeing to a low salary to secure the position, then afterward seeking more public monies for that service. Official Report of the Proceedings and Debates of the Utah Convention 890–94 (1895). One explained,

> the office is created by ordinance or by statute, the duties of the office are defined, the man is elected or appointed to that position. He enters upon the duties of the office, he agrees to perform his duties, and after his term has expired or after a certain period has expired and the work has been done, they come in and pay him more than his salary or than was provided by law for him to receive for this service. That is not right, and it is just to prevent those things that this section is proposed.

24

Id. at 892–93.  In other words, these individuals should be bound by their contracts.  Id.

Next, we consult era-appropriate dictionaries.  Conage v. United States, 346 So. 3d 594, 599 (Fla. 2022).  Our research shows that dictionaries from that era are generally consistent in how extra and compensation are defined.  Black's Law Dictionary defines "extra" as "beyond, except, without, out of, outside."  Extra, Black's Law Dictionary, 465 (1st ed. 1891).  The Universal Dictionary of the English Language similarly does so.  Extra, 2 Universal Dictionary of the English Language 1998 (1898) ("on the outside," "beyond, further than, except.").  It further provides: "Beyond what is absolutely necessary; over and above what is usual; supplemental, additional."  Id.

Bouvier's Law Dictionary defines compensation as "[a] reward for services rendered."  Compensation, 1 Bouvier's Law Dictionary 237 (rev. 6th ed. 1856).  The Universal Dictionary of the English Language states: "(1) *Lit.:* That which is given or received as equivalent for services rendered, losses sustained, sufferings endured, or in payment of a debt; amends, remuneration, payment, recompense."  Compensation, I Universal Dictionary of the English Language 1154 (1898).  Black's Law Dictionary also includes this explanation: "The word also signifies the remuneration or

25

wages given to an employee or officer.  But it is not exactly synonymous with 'salary.'" Compensation, <u>Black's Law Dictionary</u> 238 (1st ed. 1891).  It further provides: "EXTRA SERVICES, when used with reference to officers, means services incident to the office in question, but for which compensation has not been provided by law."  Extra Services, <u>Black's Law Dictionary</u> 466 (1st ed. 1891).

Since its initial enactment in 1885, this language has not been often interpreted.  The Florida Supreme Court did not do so until 1930 when it explained:

> An examination of section 11 of article 16 discloses that it applies only to two classes of claims against the state, viz.: (1) Extra compensation to officers, agents, employees, or contractors after the service rendered or the contract made; and (2) claims against the state, the subject-matter or basis for which were not provided for or authorized by preexisting law.  As to either or both such claims they can be paid only by an appropriation approved by two-thirds of the members elected to each house of the Legislature.  Both these classes of claims are personal; the first for extra compensation on an authorized contract, and the second for compensation on an unauthorized contract.

<u>Amos v. Mathews</u>, 126 So. 308, 334 (Fla. 1930).  <u>See also</u> <u>Crooks v. State ex rel. Pierce</u>, 194 So. 237, 240 (Fla. 1940).

In 1959, our sister Court addressed whether the constitutional provision precluded the State from paying the estate of a deceased employee for leave time accrued before his death.  <u>Green v. Galvin</u>, 114 So.

2d 187, 188 (Fla. 1st DCA 1959). It defined "compensation" as "the equivalent of something else; it is recompense or remuneration for services as distinguished from a gift or gratuity." Id. at 189. Keeping this in mind, the Court held that annual leave provisions were part of the fixed compensation for employees and became part of their contracts. Id. "This is not 'extra compensation' made after the services are rendered. It is compensation earned as the services were being rendered but not paid until severance of the employment contract." Id.

Based on this text, history, and precedent, we conclude that the 1885 original public meaning of "extra compensation" is additional remuneration beyond what has been provided by law or contract.

**ii.**

In 1965, the Legislature created the Florida Constitutional Revision Commission to conduct a "careful study of the constitution . . . for the purpose of eliminating obsolete, conflicting and unnecessary provisions as well as for framing an orderly and properly arranged constitution, based upon economic and social changes . . . ." Ch. 65-561 (Preamble), Laws of Fla. In a report prepared for this Commission, the clause at issue was flagged for consideration. The report inquired whether "the subject matter of present Section 11 be constitutionalized? If this limitation on the legislature is to be

27

retained, should it not be included in the Legislative Article with omission of details?" David Dickson, James Craig, Jr., & Albert L. Strum, Issues for State Constitution Revision, Florida Constitution of 1885 26 (Mar. 1966).

The commission minutes reflect:

Discussion followed on Section 11 of Article XVI, pertaining to extra compensation claims. The Committee felt that the process whereby claims were paid by the State was very inadequate. The members agreed that the intent of this section should be retained, but that it should be redrafted to enumerate the right of the Legislature to prescribe the procedures by which claims bills could be investigated before being recommended for payment.

Const. Revision Comm'n, Comm'n Minutes, Committee Minutes and Proposals 58, 61 (Feb. 11, 1966). And so, an initial draft moved the provision to the legislative article. Id. at 76. But we have located no further debate about removing this provision from the Constitution or discussion as to the meaning of "extra compensation."

The Constitutional Revision Commission submitted its report to the Legislature in January 1967. See Albert L. Strum, The Procedure of State Constitutional Change - with Special Emphasis on the South and Florida, 5 Fla. St. U. L. Rev. 569, 592 (1977). The Legislature then reworked the proposal during a special session. Id. The redesignation of the clause to general law was part of House Joint Resolution No. 1-2X. See H.R.J. Res. 1-2X, 573-574 (Fla. 1968). See also Art. XII, § 10, Fla. Const. (1968).

Turning to era-appropriate dictionaries, the definitions are consistent with the prior period. But now, in some dictionaries, "extra compensation" is a defined term. For instance, Ballentine's Law Dictionary defines "extra compensation" as "Compensation over and above that fixed by contract for work agreed to be done. Money paid out of public funds to a public officer or servant in excess of his regular salary for performance of services that are within the scope of his official duties." Extra Compensation, Ballentine's Law Dictionary 445 (3d ed. 1969) (internal citations omitted). Black's Law explains: "Within constitutional provision prohibiting Legislature from granting extra compensation to contractor, is compensation over and above that fixed by contract for agreed work, and is in nature of gratuity." Extra Compensation, Black's Law Dictionary 697 (rev. 4th ed. 1968). Likewise, "extra services" is "when used with reference to officers, means services incident to the office in question, but for which compensation has not been provided by law." Id.

American Heritage Dictionary defines "extra" as "[m]ore than usual, expected, etc.; additional." Extra, American Heritage Dictionary of the English Language 254 (1968). Compensate is to "recompensate or reimburse." Id. at 147. Webster's New Twentieth Century Dictionary is similar. It defined "extra" as "more, larger, or better than what is stipulated,

29

normal, expected, necessary, or usual; additional, supplementary; *as, extra compensation*." Extra, <u>Webster's New Twentieth Century Dictionary of The English Language</u>, 650 (2d ed. 1968). "Compensation" is "that which is given or received as an equivalent for services, debt, want, loss, suffering, etc.; amends; remuneration; recompense." <u>Id.</u> at 370.

Next, we analyze any subsequent opinions and decisions. Throughout the 1970s into the 1990s, there was a renewed focus on section 215.425, Florida Statutes. The Attorney General issued several opinions addressing different scenarios. <u>See, e.g.</u>, Op. Att'y Gen. Fla. 75-279 (1975); Op. Att'y Gen. Fla. 81-98 (1981); Op. Att'y Gen. Fla. 82-28 (1982); Op. Att'y Gen. Fla. 85-87 (1985); Op. Att'y Gen. Fla. 86-53 (1986); Op. Att'y Gen. Fla. 86-102 (1986); Op. Att'y Gen. Fla. 89-53 (1989); Op. Att'y Gen. Fla. 97-21 (1997). Quite a few address providing benefits to someone who has already retired. <u>See</u> Op. Att'y Gen. Fla. 89-53 (1989) (opining purchase of annuity for retiree constituted extra compensation); Op. Att'y Gen. Fla. 91-37 (1992) (opining that providing retiree with monetary value of leave time, contrary to city system, violated statute); Op. Att'y Gen. Fla. 92-49 (1992) (opining cost of living adjustment to someone already retired violated the statute).

Then, in 1997, our sister Court again had the occasion to address the statute. In <u>Brown v. City of Jacksonville Beach</u>, Brown appealed an order

granting the City's motion for summary judgment, finding his retirement contract violated section 215.425, Florida Statutes.  696 So. 2d 946, 946 (Fla. 1st DCA 1997).  But Brown was still rendering services when the parties executed the contract providing for additional retirement income.  Id.  As a result, the Court held that the contract did not violate the statute.  Id.

In the end, the meaning of "extra compensation" during this time reflects the language maintained the same meaning.  See generally Mazzone & Tecimer, supra, 332 (2022).  There is no evidence that a different meaning was ever intended.

### iii.

The original public meaning of "extra compensation" is additional remuneration beyond what has been provided by law or contract.  The term is not limited to bonuses and severance payments.  Instead, it is broader and encompasses any additional remuneration over and above the amount set by law or contract.

Taking that original public meaning into account and viewing it within the context of the statute, this provision prohibits public officers, agents, employees, and contractors from receiving additional remuneration—over and above what was contracted for or fixed by law—for services rendered. Cf. Rawls v. State, 122 So. 222, 222 (Fla. 1929) ("Public officers have no

31

legal claim for official services rendered, except when, and to the extent that, compensation is provided by law, and when no compensation is so provided, the rendition of such services is deemed to be gratuitous."); <u>Hanchey v. State ex rel. Roberts</u>, 52 So. 2d 429, 432 (Fla. 1951) ("The right of compensation is an incident to the office as the person holding the office is entitled to its compensation."). In other words, it prohibits any additional payment where the service has already been completed or made by contract.

This broad meaning of "extra compensation" is reinforced by the other sections of the statute. <u>See</u> Scalia & Garner, <u>supra</u>, at 167. For example, subsection (2) narrows the scope by excluding certain items, such as "bonuses or severance pay" and "a clothing and maintenance allowance given to plain clothes deputies." § 215.425(2), Fla. Stat. Subsection (4) provides guidelines for bonus schemes and severance pay. <u>Id.</u> at (4). And, lastly, subsection (5) states: "Any agreement or contract, executed on or after July 1, 2011, which involves extra compensation between a unit of government and an officer, agent, employee, or contractor may not include provisions that limit the ability of any party to the agreement or contract to discuss the agreement or contract." <u>Id.</u> at (5). Collectively, these provisions imply that "extra compensation" remains permissible so long as it is negotiated before the service in question has been fully performed.

With this in mind, we hold that two former officials—Pete Cabrera and Juan Carlos Bermudez—do not fall within the statute's prohibition. Both were still serving when the initial ordinance was enacted. Their service was not complete. They retired or left service while the ordinance was in effect. The pension became part of their compensation—earned as the services were being rendered and simply paid after that service was complete. As a result, it was not "extra compensation" made after services were rendered. Accordingly, section 215.425, Florida Statutes, does not prohibit their pensions. And so, Cabrera and Bermudez have vested rights in the pension.

But this is not the case for the remaining two officials, Sandra Ruiz, and Michael DiPietro. They were already retired and no longer serving on the council at the time of enactment. The pension was created after they had fully served their terms. It did not become part of their compensation. Their pensions qualify as "extra compensation . . . made to any officer . . . after the service has been rendered." § 215.425(1), Fla. Stat. Thus, their pensions violate section 215.425, Florida Statutes.

## C.

But this does not end our inquiry. The trial court ruled that the City was equitably estopped from denying benefits. The trial court wrote: "The [City] cannot now claim that the plan was improperly enacted to erase their

33

financial obligations to Plaintiffs, penalizing only them, all without consequence. The City's conduct, as fiduciaries, and the [former officials] reliance on that conduct, justify the invocation of equitable estoppel to prevent the City from denying promised benefits." The City maintains this was error.

The doctrine of equitable estoppel was an established principle in the English common law. See 3 William Blackstone, Commentaries on the Laws of England 307 (1768); Sir Edward Coke, Institutes of the Laws of England, Part I, § 667 (10th ed. 1703). Early on, Florida adopted the common law as its own. See Fla. Terr. Acts 1822, p. 50; Fla. Terr. Acts 1823, p. 111; § 2.01, Fla. Stat. (1829).

"Estoppel is . . . the preclusion of a person from asserting a fact by previous conduct inconsistent therewith, on his own part, or the part of those under whom be claims." Coogler v. Rogers, 7 So. 391, 394 (Fla. 1889) (citation omitted). See also State ex rel. Watson v. Gray, 48 So. 2d 84, 87–88 (Fla. 1950). This doctrine "presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct." Major League Baseball v. Morsani, 790 So. 2d 1071, 1077 (Fla. 2001). It "bars the wrongdoer from asserting that shortcoming and profiting from his or her own

misconduct. Equitable estoppel thus functions as a shield, not a sword, and operates against the wrongdoer, not the victim." Id.

"In order to demonstrate estoppel, the following elements must be shown: 1) a representation as to a material fact that is contrary to a later-asserted position; 2) reliance on that representation; and 3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon." State Dep't of Revenue v. Anderson, 403 So. 2d 397, 400 (Fla. 1981). "As a general rule, estoppel will not apply to mistaken statements of the law, but may be applied to erroneous representations of fact." Council Bros., Inc. v. City of Tallahassee, 634 So. 2d 264, 266 (Fla. 1st DCA 1994) (internal citations omitted).

Estoppel will be invoked against the government only in rare and exceptional circumstances. N. Am. Co. v. Green, 120 So. 2d 603, 610 (Fla. 1959). "Equitable estoppel has been most frequently invoked against government [entities] in cases in which the government has either made affirmative representations or knowingly acquiesced in plaintiff's conduct." Associated Indus. Ins. Co., Inc. v. State, Dep't of Lab. & Emp. Sec., 923 So. 2d 1252, 1255 (Fla. 1st DCA 2006). It has been applied in the pension context. See Branca v. City of Miramar, 634 So. 2d 604, 606 (Fla. 1994); Kuge v. State, Dep't of Admin., Div. of Ret., 449 So. 2d 389, 392 (Fla. 3d

DCA 1984); <u>Salz v. Dep't of Admin., Div. of Ret.</u>, 432 So. 2d 1376, 1378 (Fla. 3d DCA 1983).

But these cases do not involve a situation where the beneficiary's pension violated a state statute. Estoppel simply does not "apply in transactions that are forbidden by statute or that are contrary to public policy." <u>Montsdoca v. Highlands Bank & Tr. Co.</u>, 95 So. 666, 668 (Fla. 1923). <u>See also</u> <u>State ex rel. Schwartz v. City of Hialeah</u>, 156 So. 2d 675, 676 (Fla. 3d DCA 1963). Because "estoppel cannot be applied against a governmental entity to accomplish an illegal result," the trial court erred by applying it to the claims of Sandra Ruiz and Michael DiPietro. <u>Branca</u>, 634 So. 2d at 607. We affirm the trial court's application of estoppel as to Cabrera and Bermudez. <u>Id.</u>

## IV.

Since Cabrera and Bermudez satisfied the ordinance's criteria without violating section 215.425, Florida Statutes, their pension rights vested. For that reason, the City's subsequent repeal of the initial ordinance constitutes an impermissible impairment of vested rights under Article I, Section 10 of the Florida Constitution. <u>See</u> <u>Whitaker</u>, 86 So. at 250 ("All governmental powers of the state are subject to the limitations imposed by the [Florida] Constitution."). The City is estopped from divesting them of these benefits.

36

Ruiz and DiPietro, however, stand on different footing.  They have acquired no such rights.  Their pensions, while consistent with the ordinance, run afoul of section 215.425, Florida Statutes.  One cannot obtain a vested right in an illegal payment.  Because equity will not enforce an illegal act, equitable estoppel cannot be invoked to compel the City to pay benefits that the law forbids.  So the City is not barred from denying their benefits.

Accordingly, we affirm the final judgment for Cabrera and Bermudez. We reverse the final judgment for Ruiz and DiPietro.

Reversed in part, Affirmed in part.